[No. E013783. Fourth Dist., Div. Two. Jan. 26, 1996.]

PETER GALLUP, Plaintiff and Respondent, v.
BOARD OF TRUSTEES OF THE ALTA LOMA SCHOOL DISTRICT,
Defendant and Appellant.

## COUNSEL

Parker, Covert & Chidester, Spencer E. Covert and Margaret A. Chidester for Defendant and Appellant.

Elaine Grillo Canty for Plaintiff and Respondent.

## OPINION

McDANIEL, J.*—The Board of Trustees (the Board) of the Alta Loma School District (the District) has appealed from a judgment granting the petition of Peter Gallup (Gallup) for administrative mandamus. (Code Civ. Proc., § 1094.5.)[1] The petition successfully compelled the Board to set aside its decision dismissing Gallup, an elementary school psychologist, and to order Gallup's reinstatement. The central issue presented by the Board's appeal is whether the District's replacement of its three elementary school psychologists by an administrative psychologist and independent contractor psychologists was a reduction or discontinuation of a "particular kind of

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.

[1]The Board's notice of appeal was also from the "[j]udgment" denying its motions to vacate the judgment and enter a different judgment (Code Civ. Proc., § 663) and for a new trial. An order denying a motion to vacate under section 663 is appealable (*Howard* v. *Lufkin* (1988) 206 Cal.App.3d 297, 303 [253 Cal.Rptr. 422]; an order denying a new trial is not. (*Rodriguez* v. *Barnett* (1959) 52 Cal.2d 154, 156 [338 P.2d 907].) We shall dismiss the Board's purported appeal from the part of the order denying its motion for a new trial accordingly.

service" pursuant to section 44955 of the Education Code.[2] The trial court ruled that it was not, and therefore that Gallup's termination was impermissible. The Board contends that the court's ruling was not supported by substantial evidence. Because the relevant evidence was undisputed, the issue is whether, as a matter of law, it does not support the trial court's ruling. In our view, for the reasons stated below, it does not. We shall reverse the judgment accordingly.

FACTUAL AND PROCEDURAL BACKGROUND

On February 23, 1993, as part of a program to cut $1.1 million from its budget for the 1993-1994 school year, the Board adopted a "Resolution . . . Regarding a Reduction or Discontinuance of Particular Kinds of Service" pursuant to section 44955. According to the resolution, 14 full-time equivalent positions would be reduced or discontinued at the end of the 1992-1993 school year. The positions affected were: eight teachers; one nurse; one district counselor; one director of children's services, and three elementary school psychologists. The three elementary school psychologists employed by the District at the time of the resolution were, with their seniority dates (first days of employment): (1) Gallup, July 1, 1980; (2) Fred Quici (Quici), September 13, 1988, and (3) Jillet Parsons (Parsons), November 1, 1988.

On March 2, 1993, the District notified Gallup and Parsons that their services would not be required for the 1993-1994 school year. Gallup requested a hearing, and the District filed a formal "accusation" against him, pursuant to section 44949. Parsons did not request a hearing and obtained employment for the 1993-1994 school year elsewhere. Quici, who, unlike Gallup was also credentialed as a teacher and an administrator, did not

---

[2]Education Code section 44955, the " 'economic layoff[]' " statute (*Cousins v. Weaverville Elementary School Dist.* (1994) 24 Cal.App.4th 1846, 1849 [30 Cal.Rptr.2d 310]), recites in relevant part: "(b) Whenever in any school year the average daily attendance in all of the schools of a district for the first six months in which school is in session shall have declined below the corresponding period of either of the previous two school years, whenever the governing board determines that attendance in a district will decline in the following year . . . *whenever a particular kind of service is to be reduced or discontinued* not later than the beginning of the following school year, or whenever the amendment of state law requires the modification of curriculum, and when in the opinion of the governing board of the district it shall have become necessary by reason of any of these conditions to decrease the number of permanent employees in the district, the governing board may terminate the services of not more than a corresponding percentage of the certificated employees of the district, permanent as well as probationary, at the close of the school year. Except as otherwise provided by statute, the services of no permanent employee may be terminated under the provisions of this section while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render." (Italics added.)

Unless otherwise noted, all statutory references are to the Education Code.

receive a layoff notice and was recommended for the newly created position of administrative psychologist, with the responsibility of hiring independent contractor psychologists (independent psychologists) to perform psychological testing and assessment services for the District.

Thereafter, the cases of all the District's employees who had received layoff notices and had requested hearings (Gallup and seven teachers) were consolidated in a hearing before an administrative law judge (ALJ). At the outset of the second day of the hearing, because of resignations and leave of absence requests submitted since the first day of the hearing over two weeks earlier, the District dismissed its accusations as to the seven teachers and the hearing proceeded as to Gallup only.

At the hearing, Dean Enfield (Enfield), the District's administrator of personnel and pupil personnel services, testified that: (1) the District's department of psychology had been restructured to create an administrative psychologist position and to use the services of independent psychologists; (2) Quici had been recommended for the administrative psychologist position and was recruiting independent psychologists; (3) the restructuring would save money; (4) psychological services such as intellectual and emotional functional testing, participation in the individual educational program (IEP) meetings following the testing, and any required counseling by a psychologist (as opposed to a counselor) were mandated by law; (5) independent psychologists with the proper credentials would provide the testing and participate in the IEP;[3] (6) the administrative psychologist would spend a "very minimal time," probably less than 20 percent, on "actual psych[ological] services"; (7) the major part of the administrative psychologist's time would be spent in recruiting and screening the independent psychologists and in evaluating the quality of their reports; (8) the work year for each of the District's elementary school psychologists whose positions had been eliminated (the employee psychologists) was 194 eight-hour days, or approximately 1,500 hours; (9) 35 percent of the employee psychologists' time or a total of about 1,700 hours was devoted to mandated services; (10) the 35 percent figure was based on the psychologists' 1991-1992 "FEMAC" reports, federal forms where the psychologists recorded the manner in which they spent their time; (11) the FEMAC reports were the only accurate way of determining the number of hours the psychologists actually spent in assessments; (12) according to Gallup's FEMAC form, he spent less than 20 percent of his time in mandated assessment activities in 1991-1992; (13) it cost a little more than one full-time psychologist to do the mandated

---

[3]As to the required counseling by a psychologist, Enfield testified that this was not a normal requirement and that he did not know if any student was currently being counseled by a psychologist.

services; (14) the nonmandated services which were currently done by the employee psychologists, such as working with parents, would be done by nurses and counselors; (15) the administrative psychologist would monitor the performance of the independent psychologists on a daily basis; (16) the independent psychologists would be employed by the District but would not be employees of the District, and (17) the independent psychologists would not receive health and welfare benefits, would not have regularly established work hours, and would not have the type of regular evaluation which the District required for its certificated employees.

Reed Montgomery (Montgomery), the District's superintendent, testified that: (1) the District had examined eight different layoff scenarios; (2) the recommendation to eliminate the three psychologist positions was "the best [the District] could come up with"; (3) by eliminating the three positions the District would be able to save money; "provide the same service" (*post*); run a more effective program and retain more classroom teachers; (4) the District would save money "by contracting out as opposed to keeping full time psychologists with health and welfare benefits and other salary benefits"; (5) the District was currently paying $140,000 for the two full-time positions which would be discontinued, and it would cost between $90,000 and $95,000 to use independent psychologists; (6) the District would run a more effective program by getting "better use of [its] time and more flexibility as to who [it] brought in," and (7) the District could be more flexible by hiring a Spanish-speaking psychologist to test an expected influx of bilingual children.

Quici testified that: (1) the independent psychologists would "come into contact with children through [his] direction"; (2) "[he] would see the referral from the school site, would then assign the referral to the particular individual, and that individual would then make contact with the school site or with the parent to do the testing"; (3) some of the psychologists who were willing to serve in a contract capacity were currently employed as school psychologists for other districts and would conduct tests for the District after the end of their work days or on Saturdays in the students' homes; (4) if those psychologists were unable to attend the IEP meetings, either he, Quici, would cover the meetings or the psychologists would participate in the meetings by telephone; (5) for the 1993-1994 school year, he would need to contract with independent psychologists for about 1,700 hours; (6) the 1,700-hour figure was based at least 50 percent on the FEMAC forms; (7) the other documentation he relied on was the number of assessments done in the 1991-1992 school year; (8) he took approximately 10.9 hours per assessment and Gallup took an average of 3.6 hours per assessment, and (9) the daily contract rates for independent psychologists would be "$275 for

triennials [three-year psychological evaluations of all special education students], $300 for routine referrals, i.e., academic problems, and $400 for referrals involving more time, perhaps SED referrals, bilingual, severely handicapped."

Robert Gayl (Gayl), who had been the coordinator of special education for the District from 1986 to 1989, testified that: (1) a FEMAC report was "absolutely not" the best way to calculate the actual amount of a psychologist's time devoted to mandated services, and (2) under the District's proposed plan, "a consultant coming in not knowing the site or the teachers . . . , not knowing the student, not getting to know the family, not being able to do some of the follow-up work or having the background knowledge . . . [would not] be able to provide appropriate services to those children."

Daniel Warden (Warden), the administrator of business services for the District, testified that: (1) the initial, "ballpark" figure he projected to the Board was that the District would save about $47,000 by eliminating Gallup's and Parsons's positions and hiring independent psychologists for the same amount of person days; (2) the $47,000 (actually, $43,000, see *post*) was based on the elimination of Gallup's and Parsons's salaries, benefits, expense allowances and payroll costs ($140,000) and the payment to independent psychologists of $250 per day ($97,000); (3) his current estimate of the payment to independent psychologists based on the number of assessments the psychologists would do and the prices the District would pay was about $92,000 rather than $97,000; (4) the $92,000 was based on Quici not doing any of the assessments; (5) if Quici did any of the assessments, there would be a further saving; (6) he, Warden, did not decide who did the assessments; (7) his original estimate was based on keeping the same resources available in terms of person days; (8) that was a conservative estimate because he did not think that the District would need that much independent psychologist time if the psychologists were limited to assessments; and (9) in the 1993-1994 school year, the District would need to do 32 initial assessments and 120 triennial assessments.

Parsons, the most junior employee psychologist, testified that: (1) Quici had been in charge of the psychology department during the 1991-1992 school year but had not supervised or evaluated her or Gallup; (2) she, Gallup, and Quici were each assigned to 3 of the District's 9 elementary schools; (3) in the current, 1992-1993 school year, she and Gallup decided that he would take one of her schools and she would take one of his; (4) the average time it took her to do an assessment was 10 hours; (5) she spent about 85 to 90 percent of her time on mandated services; (6) the District's proposed plan for psychological services would not work because

the consultants would be unfamiliar with the school site and the teachers and therefore would be unable to place students who qualified for a regular education class in the least restrictive environment, and the consultants who did not attend the IEP meetings would prevent the teachers and parents from making educated decisions; (7) to her knowledge, neither she, Gallup, nor Quici had ever attended an IEP meeting for a person who had done the assessment but was unable to attend the meeting, and (8) for continuity and for understanding the student's best interests, the person who did the evaluation should be present at the IEP meeting.

Gallup did not testify.

After receiving written arguments, the ALJ rendered a proposed decision in which he determined that "[c]ause relating to the welfare of the schools and the pupils thereof has not been established for the termination of [Gallup's] services." Such determination was based on findings, among others, that: "The bare-bones performance of those mandated services in the District next year will require all of more than two full-time equivalent positions. If Peter Gallup is laid off, it is clear that the District will continue his identical kind of service and position with the use of contract employees, hopefully at less expense; those contract employees would perform, day by day and site by site, exactly the same job functions that Peter Gallup would perform, under exactly the same certification or licensing requirements. . . . [¶] . . . The issue is whether the District may terminate the services of a permanent certificated employee and yet continue the identical kind of service and position held by the terminated employee. The answer is no; the reported cases have never gone so far as to authorize a termination under these circumstances."

Thereafter, the Board modified the foregoing findings and determined that there was cause to terminate Gallup. The Board's modified findings recited that: "District psychologists presently perform both mandated and non-mandated services. The District has made plans for independent contractors who meet applicable credential and licensing requirements to perform mandated services commencing July 1, 1993. There is no assurance that any non-mandated services presently being performed will continue after June 30, 1993. [¶] . . . The issue is whether the district may terminate the services of a permanent certificated employee by eliminating his particular kind of service even though a service continues to be performed in a different manner by the District. As long as the required services will be provided, the District may properly change the manner of their provision and reduce or eliminate the existing kind of particular service used to provide them. The District does not propose to continue the identical kind of services

now performed by Respondent Gallup. Mandated services will continue only to the extent required by law, and will be performed in a different manner. Non-mandated services now performed by psychologists will not be performed by the independent contractors. Non-mandated services now performed by Gallup may be performed by other existing non-psychologist employees, or may not be performed at all. The reported cases authorize a termination under these circumstances."

Four of the five members of the Board adopted the modified decision and voted to terminate Gallup pursuant thereto. Thereafter, Enfield notified Gallup that his services were terminated.

Gallup then petitioned the superior court to issue a writ of mandate directing the Board to reinstate him to his position of school psychologist, together with all backpay and benefits. The Board opposed the petition and Gallup replied to the opposition.

After a hearing, the trial court entered a tentative decision granting the petition. Such decision recited in relevant part:

"[A]t the [administrative] hearing, the Board presented evidence that the mandated services could require the equivalent of only one full time psychologist (working on contract) plus an administrative psychologist spending 20% of his time on mandated services and 80% on the administration of contract labor. There was also evidence that the Board had budgeted to hire two full-time contract psychologists plus the administrative psychologist for 1993-1994. The Board's witness, Daniel Warden . . . estimated that to provide the mandated services through some combination of contract labor and the administrative psychologist would cost approximately $162,000.

"Petitioner offered evidence that the mandated psychological services would have to be administered in exactly the same way as they had been previously, i.e., by certified school psychologists performing the tests and evaluations *in the legally prescribed manner*. Petitioner also put on evidence that, in order to continue to provide the mandated psychological services, the district would need to hire at least the equivalent of two full-time psychologists, whether as regular employees or through the use of contract labor. Finally, petitioner presented evidence that the cost of two FTE psychologists, as regular employees, would be $135,616." (Italics added.)

". . . The Board argues that 1) if only the mandated psychological services are performed and 2) they are performed by contract labor, then the Board has sustained its burden of showing that the services at issue will

continue to be performed—but in a different manner. The petitioner contends that he has made an affirmative showing that the system proposed by the Board would continue identical kinds of services and positions performed and held by the terminated psychologists and would not prove any more economical than the one in place.

"The court concludes that petitioner has succeeded. The weight of the evidence shows that performing the mandated services will require employing the equivalent of two full-time psychologists. The mandated services must be performed by psychologists and cannot be performed by other personnel. *The services will not be performed in a different manner. They will merely be performed by a different psychologist.* The evidence does not even support a finding that the contract labor will be cheaper." (Italics added.)

". . . [t]he Board cannot decide to have the mandated services provided by anyone other than a psychologist. *The services must continue to be provided in the same way by the same kind of 'expert.' . . .*" (Italics added.)

"The case which controls is *Santa Clara Federation of Teachers* v. *Governing Board of Santa Clara Unified School District* (1981) 116 Cal.App.3d 831 [172 Cal.Rptr. 312], in which the school board wanted to replace nurses providing health care with other employees providing the same care. The appellate court, in upholding the trial court's finding that this did not constitute a change in a particular kind of service, stated:

" 'Appellants [the Board] point to nothing in the record to establish that there would be a difference in the method or manner of providing these health services, or in the services themselves. Appellants concede that the difference is only that a person other than the nurses will provide those services.' (*Id.* at 844.)

"A similar situation is presented here. *The Board cannot point to any evidence to show that the contract psychologists will (or could) provide the mandated services any differently than would the employee-psychologists. The only difference is that they will be working under contract rather than as employees. But their employment status does not alter the particular kind of service they provide.* [Italics added.]

"The last case to be considered is *San Jose Teachers Assn.* v. *Allen* (1983) 144 Cal.App.3d 627 [192 Cal.Rptr. 710, 52 A.L.R.4th 283], upon which the Board relies for the proposition that a school district may decide to provide mandated services on a contract basis. The *San Jose* court did not discuss whether this would be its holding when the contract services would be

provided by the same kind of professional in precisely the same manner as had been done previously. If that rule were to be applied here, it makes a mockery of the concept of permanent employee. In any case where a school district decided it could manage more cheaply with contract labor, it could then terminate all its permanent employees, replace them with contract workers and call it a change in the particular kind of service merely because the workers were under contract and not permanent.

*"The evidence fails to support a finding that the Board's plan constitutes a change in the manner in which psychological services are provided* such as would justify the termination of the petitioner. Additionally, the weight of the evidence does not support that it was necessary to terminate three psychologists. At best, the Board has shown justification for terminating one psychologist. The evidence reflects that two psychologists are necessary to perform the mandated services and that two permanent employees are actually cheaper than one administrator combined with contract labor." (Italics added.)

Thereafter, the trial court entered a judgment granting Gallup's petition and issued a peremptory writ of mandamus commanding the Board to set aside its decision to terminate Gallup and to reinstate him in his position of school psychologist, with backpay and benefits.

The Board moved to vacate the judgment and for a new trial. Gallup opposed the motions. After a hearing, the trial court denied the motions. This appeal followed.

DISCUSSION

I

*Standard of Review*

In a case such as this, where the trial court was required to exercise its independent judgment on the evidence (*Alexander* v. *Board of Trustees* (1983) 139 Cal.App.3d 567, 572 [188 Cal.Rptr. 705]), " 'the appellate court reviews the findings of the trial court to determine whether they are supported by substantial evidence on the whole record.' [Citations.] The trial court's judgment must be upheld on appeal if supported by substantial evidence. All conflicts are resolved in favor of the prevailing party, who is entitled to the benefit of every reasonable inference to support the judgment. [Citations.] We will characterize evidence as substantial if it is of 'ponderable legal significance . . . reasonable in nature, credible, and of solid

value.' [Citations.] Alternatively, substantial evidence requires 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion, . . .' [Citation.]" (*Duax* v. *Kern Community College Dist.* (1987) 196 Cal.App.3d 555, 562 [241 Cal.Rptr. 860].) "It is obvious that there can be substantial evidence to support findings either way on issues as to which evidence is conflicting." (*Jackson* v. *City of Pomona* (1979) 100 Cal.App.3d 438, 451 [160 Cal.Rptr. 890].) "However, where [as here] the facts are undisputed, the issue is one of law and the appellate court is free to reach its own legal conclusion from such facts." (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 872 [269 Cal.Rptr. 647].)

## II

### *Section 44955*

As noted, section 44955 allows a school district to terminate the services of a permanent, certificated employee whenever the employee's "particular kind of service is to be reduced or discontinued." The seminal case on the discontinuation of a particular kind of service is *Fuller* v. *Berkeley School Dist.* (1934) 2 Cal.2d 152 [40 P.2d 831].[4] In *Fuller*, the petitioner (Fuller) had been a certificated kindergarten teacher in the Berkeley School District for 10 years. During that period, she had served as assistant kindergarten director, as associate kindergarten director, and as acting kindergarten director. In all three capacities she had taught in the kindergartens; as an assistant or associate director she had assisted the director when the number of children in any one kindergarten exceeded a specified number. In the second term of Fuller's tenth year, the governing board of the district reorganized the administration of the kindergartens to provide for the kindergarten director to teach one class in the morning and one in the afternoon. Before that time, all the kindergarten teachers had taught for only a half day. As a result of the reorganization, the board dismissed all the assistant and associate kindergarten directors (including Fuller, who was then an associate director) at the end of the school year.

The trial court denied Fuller's petition for a writ of mandate and the Supreme Court affirmed the judgment, reasoning in relevant part: "It is urged that inasmuch as the employment involved here was kindergarten teaching and kindergarten teaching is still a service being performed in the school district, the service performed by the plaintiff has not been discontinued. *But the particular kind of service which the plaintiff was employed to*

---

[4]The statute at issue in *Fuller* was section 5.710 of the School Code, which recited in relevant part: " 'It is hereby provided that whenever it becomes necessary to decrease the number of permanent employees in the school district . . . on account of the discontinuance of a particular kind of service in such district, the governing board may dismiss such employee at the close of the school year.' " (2 Cal.2d at p. 158, italics omitted.)

*render has been discontinued.* That more than one *kind* of kindergarten service, viz., three *kinds* or *classes* of such service, were established in the district prior to the plaintiff's dismissal is fully supported by the record here presented, and no showing is made that the action of the board was not taken in good faith." *(Fuller v. Berkeley School Dist., supra,* 2 Cal.2d 152, 159, italics added.)

*Fuller* was used as the basis for the Supreme Court's decision the same day in *Davis* v. *Berkeley School Dist.* (1934) 2 Cal.2d 770 [40 P.2d 835]. The *Davis* opinion recites in its entirety as follows:

"The plaintiff appealed from a judgment that she was not entitled to a writ of mandate to compel her reinstatement as an employee of the defendant Berkeley School District of Alameda County.

"The plaintiff was performing services as a traveling teacher in art. Three such teachers were employed by the district as experts to go from school to school and give instruction in that subject to certain classes and to the regular classroom teacher, who also gave instruction in the subject. The service performed by these so-called traveling teachers in the subject of art was discontinued at the end of the school year 1931-1932, of which the plaintiff was given due notice. The subject was thereafter taught only by the regular departmental teachers and by the supervisor of art who had theretofore also taught that subject.

"The disposition of this appeal is governed by the principles involved in the case of *Fuller* v. *Berkeley School District of Alameda County,* S.F. No. 15077 *(ante,* p. 152 [40 P.2d 831]), this day decided. From the facts presented herein the same conclusions must be drawn. On the authority of that case the judgment is affirmed." *(Davis* v. *Berkeley School Dist., supra,* 2 Cal.2d 770, 770-771.)

*Davis* was relied on in *Campbell Elementary Teachers Assn., Inc.* v. *Abbott* (1978) 76 Cal.App.3d 796 [143 Cal.Rptr. 281], where the court affirmed the trial court's judgment that employees, including psychologists, who had been terminated by the Campbell Union School District were not entitled to a writ of mandate to annul the district's decision. On appeal, the teachers association argued that " 'the District may not terminate teachers under the guise of reduction in particular services when the District is actually continuing to offer the same services, but by different personnel.' " *(Id.* at p. 812.) The court disagreed, reasoning: "It is true that a district may not dismiss an employee pursuant to section 13447 [now section 44955] and yet continue the identical kind of service and position held by the terminated

employee. [Citation.] But the *particular kind* of service of the employee may be eliminated even though a service continues to be performed or provided in a different manner by the district." (*Ibid.*, italics in original.) The court compared its case to *Davis*, and concluded: "Where, as here, the district [in *Davis*] apparently contemplated a change in the method of teaching or in the particular kind of service in teaching a subject, there was a discontinuance of the former particular kind of service." (*Ibid.*)

*Campbell*'s distinction between continuing "the identical kind of service and position held by the terminated employee," which was prohibited, and continuing "a service . . . performed or provided in a different manner," which was allowed, was relied on in *Santa Clara Federation of Teachers* v. *Governing Board* (1981) 116 Cal.App.3d 831 [172 Cal.Rptr. 312], and *San Jose Teachers Assn.* v. *Allen* (1983) 144 Cal.App.3d 627 [192 Cal.Rptr. 710, 52 A.L.R.4th 283], cases which, as noted, were crucial to the trial court's decision in the case here.

In *Santa Clara*, which the trial court determined was controlling here, the trial court found that the district and its board were not reducing sufficient health services to terminate any of the respondents. On appeal, the district and the board argued that there was no evidence to support the trial court's finding, because first aid assistance, health instruction, and the handling of child abuse were to be provided by employees other than nurses, i.e., in a "different manner" (*Campbell, supra,* 76 Cal.App.3d at p. 812). The court disagreed, reasoning that "*Campbell* also holds that a district may not dismiss an employee pursuant to section 13447 [now section 44955] and yet continue the identical kind of service and position held by the terminated employee. . . . Appellants point to nothing in the record to establish that there would be a difference in the method or manner of providing these health services, or in the services themselves. Appellants concede that the difference is only that a person other than the nurses will provide these services. It appears, therefore, that the trial court's findings are supported by substantial evidence." (*Santa Clara Federation of Teachers* v. *Governing Board, supra,* 116 Cal.App.3d 831, 844.)

In *San Jose Teachers Assn.*, which the Board contends should control here, the school district terminated 409 full-time certificated employees pursuant to its decision to reduce or discontinue particular kinds of services. In their appeal from the denial of their petition for a writ of administrative mandamus, the employees contended, among other things, that the district could not eliminate all junior and senior high school counseling positions because an estimated 10 percent of the counselors' services consisted of statutorily mandated services for handicapped students. The court disagreed, reasoning

that "[t]he record indicates that special counseling services would be provided under special contract. As long as the required services will be provided, the district could properly change the manner of their provision and reduce or eliminate the existing particular kind of service used to provide them. (*Campbell Elementary Teachers Assn., Inc.* v. *Abbott*, *supra*, 76 Cal.App.3d at pp. 811-812.)" (*San Jose Teachers Assn.* v. *Allen*, *supra*, 144 Cal.App.3d 627, 639-640.)

In refusing to apply the foregoing holding to the case here, the trial court concluded that "[t]he *San Jose* court did not discuss whether this would be its holding when the contract services would be provided by the same kind of professional in precisely the same manner as has been done previously." The trial court went on to say that the application of such a rule to the case here would "make[] a mockery of the concept of permanent employee" because it would allow any school district to economize by replacing "all its permanent employees" with contract workers.

## III

*As a Matter of Law There Is No Evidence to Support the Trial Court's Finding That the Mandated Services Would Not Be Performed in a Different Manner by the Independent Psychologists*

■ The Board contends that the trial court's finding that the mandated services would not be performed in a different manner by the independent psychologists is not supported by substantial evidence. However, because the evidence is undisputed, this is not a substantial evidence case. In our view, as a matter of law, *there is no evidence* to support the trial court's finding.

The trial court reasoned that the services would not be performed in a different manner because they would be performed by "certified school psychologists . . . in the *legally prescribed manner*" (italics added), and "must continue to be provided in the *same way*." (Italics added.) Similarly, Gallup argues that "the district [cannot] change the general manner in which the [mandated] service will be provided since that is also mandated by law." However, the foregoing reasoning begs the question of whether there is a legally prescribed manner of performing or providing mandated services, i.e., whether such services can be performed or provided in only one way.

In *San Jose Teachers Assn.*, the court held that legally mandated counseling services could be provided in two different ways, by special contract or by full-time employees, and that the use of contract counselors was a

"change [in] the manner of the [services'] provision." (*San Jose Teachers Assn.* v. *Allen, supra,* 144 Cal.App.3d 627, 639-640.) When the trial court here stated that "[t]he *San Jose* court did not discuss whether this would be its holding when the contract services would be provided by the same kind of professional in precisely the same manner as had been done previously," it was acknowledging that contract services by a professional could be provided in a different manner than services by the same kind of professional as an employee.

Moreover, if the trial court and Gallup were correct in assuming that mandated services can be performed in only one way, then the "particular kind of service" provision of section 44955 could never apply to mandated services. However, there is nothing in the statute or the relevant case law to support such an interpretation. Further, such an interpretation ignores the words "kind of" in "particular *kind of* service," (italics added), and, "[i]f possible, we must . . . give significance to every word, phrase, sentence, and part of a statute." (*Service Employees Internat. Union* v. *City of Redwood City* (1995) 32 Cal.App.4th 53, 58 [38 Cal.Rptr.2d 86].)

In *Fuller* v. *Berkeley School Dist., supra,* 2 Cal.2d 152, where the words "particular kind of service" were first interpreted, the Supreme Court held that the particular "kind," or "class," of service which Fuller had been employed to render was kindergarten teaching *as an associate director,* and that that particular kind of service had been discontinued. Here, the particular kind of mandatory service which Gallup had been employed to render was psychological assessment *as an in-house employee,* and that particular kind of service had been (virtually) discontinued.[5] (See also *Campbell Elementary Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d 796, 812: "[A] district may not dismiss an employee pursuant to section 13447 and yet continue the identical *kind* of service *and position* held by the terminated employee." (Italics added.)) Here, the District did not continue either the identical kind of service or the position of employee psychologist.

In *Santa Clara,* which the trial court relied on here, the services in question were to be provided by different *employees;* here, as in *San Jose,*

---

[5]*Fuller* also addressed the concern, expressed by the trial court here, that the endorsement of the district's action would allow any school district to terminate all its permanent employees and replace them with contract employees. In regard to that issue, the *Fuller* court stated: "On petition for rehearing great apprehension is expressed by the petitioner lest the whole teachers' tenure system be upset if the decision stand. This fear is without foundation under the facts in the case." (*Fuller* v. *Berkeley School Dist., supra,* 2 Cal.2d 152, 161.) Here, similarly, the trial court's fear is without foundation under the facts in this case. (See, e.g., Montgomery's testimony, *ante,* that the elimination of the employee psychologist positions would allow the District to retain more classroom teachers.) Moreover, the statute at issue in *Fuller,* like subdivision (b) of section 44955 here, allows only a "decrease [in] the number of permanent employees," and does not allow a termination of all such employees

the services were to be provided by *nonemployees*.[6] The distinction is crucial because, contrary to the trial court's conclusion that the status of the independent psychologists would not alter the manner in which they provided the mandated services, as nonemployee off-site providers, the independent psychologists would necessarily provide services in a different manner than employee on-site providers. Indeed, *Gallup's own witnesses*, Gayl and Parsons, testified that "consultants coming in" who were unfamiliar with the school site or the teachers and were unable to do some of the follow-up work would not provide appropriate services, i.e., would not provide the same kind of services as had the on-site employee psychologists.

Significantly, in reaching its result, the *Santa Clara* court reasoned that the district and the board "point to nothing in the record to establish that there would be a difference in the method or manner of providing these health services, or in the services themselves. Appellants concede that the difference is only that a person other than the nurses will provide these services." (*Santa Clara Federation of Teachers* v. *Governing Board, supra,* 116 Cal.App.3d 831, 844.)

*Such is not the case here.* Here, the Board contends that it would provide the mandated services in a different manner by utilizing independent psychologists. Moreover, there was no evidence that the independent psychologists would *not* perform the mandated services in a different manner, i.e., would perform the services in the same manner as the employee psychologists, and there was abundant evidence that the independent psychologists would not perform the services in the same manner as the employee psychologists. Specifically, there was evidence that the independent psychologists, as opposed to the employee psychologists: (1) would not be assigned to, much less, as Gallup and Parsons had done, "trade" specific schools, but would receive referrals from the administrative psychologist; (2) would "type" their own reports; (3) would have their reports evaluated by the administrative psychologist; (4) would have their performances monitored by the administrative psychologist on a daily basis; (5) would, in some cases, conduct tests after the end of their work days or on Saturdays in the students' homes; (6) would, in some cases, not attend the IEP meetings, and (7) would, in the case of the anticipated Spanish-speaking psychologist, do the testing partly or totally in Spanish.

---

[6]Gallup argues the independent psychologists "would, in fact, be contract *employees*" (italics in original) because, among other things, their "hours, work place and scheduling" would be regulated by the District. However, as noted, Enfield testified that the independent psychologists would not be employees of the District and would not have regularly established work hours, and Quici testified that the independent psychologists would schedule their own testing, which might, in some cases, be done after their work days or on Saturdays at the students' homes.

The *only* evidence Gallup cites in support of the proposition that the independent psychologists would continue to perform the mandated services in the same manner is Montgomery's testimony, *ante*, that the District would be able to "provide the same service" by eliminating the employee psychologist positions. Gallup argues that the foregoing statement "constitutes an open admission that the district basically did not intend to change the [manner of the] services provided." However, Montgomery also testified that he was convinced that the new program would allow the District to get better use of its time and to hire a greater variety of people, such as a Spanish-speaking psychologist. In view of that additional testimony, Montgomery's testimony that the elimination of the employee psychologist positions would allow the District to provide the "same service" was not an admission that the District intended to provide the service *in the same manner*.

Otherwise, Gallup relies on the evidence that "the . . . new providers will be the same kind of professionals (school psychologists) performing the same services." However, as the *Santa Clara* court emphasized, the issue is not *who* will perform the services, but *how* the services will be performed. Here, the undisputed evidence showed that the "new" providers would not perform the services in the same manner as the employee providers. Accordingly, there was no evidence to support the trial court's finding that they would; hence it was error.

The District also contends that there was no substantial evidence to support the trial court's findings that "performing the mandated services will require employing the equivalent of two full-time psychologists," and that "two permanent employees are actually cheaper than one administrator combined with contract labor."[7] However, we need not consider whether *two* permanent employees would be necessary or whether *two* permanent employees are cheaper than one administrator and contract labor, because the District replaced *three* permanent employees by an administrator and contract labor. Warden's testimony indicated that such replacement amounted to a saving of $48,000 ($210,000 - $162,000 ($70,000 + $92,000)), and Montgomery testified not only that the replacement would save the District money, but also that the use of contract labor would enable the District to be more efficient and more flexible. Such testimony showed that the District acted reasonably in eliminating all three employee psychologist positions and did not act fraudulently, arbitrarily, or capriciously in doing so. (*Brough v. Governing Board* (1981) 118 Cal.App.3d 702, 717 [173 Cal.Rptr. 729].)

---

[7]Gallup argues that "the trial court found that the weight of the evidence did not support the claim that a cost saving would result from implementation of the school board's plan." However, Enfield, Montgomery and Warden testified that there would be such a saving, and *no one* testified that there would not.

Insofar as the trial court was suggesting that the District should have retained two of the positions instead of discontinuing all three and replacing them with an administrative psychologist and contract labor, the court was improperly attempting to substitute its judgment for that of the District. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834-835 [27 Cal.Rptr. 19, 377 P.2d 83].)

## IV

### *Gallup's Contentions as to the Impropriety of the District's Action*

Gallup contends that he, not Quici, should have been assigned to the administrative psychologist position because he is senior to Quici and has a pupil personnel services credential. Gallup acknowledges that Quici has an administrative services credential and that he, Gallup, does not. Gallup argues, nevertheless, that both he and Quici "have a credential to perform the job," and that the decision should have been made on the basis of seniority. However, the job description for the administrative psychologist position required, among other things, an administrative credential and administrative or supervisory experience. The record showed that Quici had an administrative credential and administrative and supervisory experience and that Gallup did not. In view of such showing, Gallup's contention that he is as "certificated and competent" (§ 44955, subd. (b)) as Quici to be the administrative psychologist is without merit.

Equally without merit are Gallup's suggestions that the District was attempting to "circumvent[] tenure laws by simply deciding to contract out for the service being provided by the employee(s) whom it wishes to terminate," and that the District's reorganization plan may have been "merely a ruse used to eliminate certain employees for other than legitimate statutory reasons." As the Supreme Court said in *Fuller*, "no showing is made that the action of the board was not taken in good faith." (*Fuller* v. *Berkeley School Dist.*, *supra*, 2 Cal.2d 152, 159.)

Gallup also contends that the District may not contract for psychological services because such services must be performed by a "school psychologist," if available, and a "school psychologist" cannot perform any of the activities authorized by his or her credential unless he or she is employed by the district for whom he or she performs the activities.

In support of the foregoing proposition, Gallup relies on section 2909 of the Business and Professions Code. As relevant here, section 2909 provides only that a person who holds a valid and current credential as a school

psychologist *and* who is employed by an "organization" may provide "activities of a psychological nature" within the organization and may not provide "psychological services" to the general public when a license is required for such services[8] Section 2909 does not provide that a school psychologist must be employed by an organization, much less by a school district, in order to perform any of the activities authorized by his or her credential. Nor does section 2909 provide that a school psychologist who is employed by one organization may not render services as a school psychologist for another organization. (As noted, Quici testified that some of the candidates for the independent psychologist positions were currently employed as school psychologists for other districts.)

Gallup interprets Business and Professions Code section 2909 as providing that "[a]ny school psychologist who attempts to practice outside the confines of his employment is . . . not covered by the exception [to the licensing requirements in Business and Professions Code section 2903] and such practice would be unlicensed and unlawful." If Gallup is contending that section 2909 precludes a school psychologist who is employed by an organization from practicing as a licensed psychologist outside the organization, we agree. However, such interpretation is irrelevant to the situations here, namely of a school psychologist who is not employed by a school district or who is employed by one district and who wishes to practice as a school psychologist for a second district. Gallup begs the question of whether Business and Professions Code section 2909 applies to such individuals by assuming that a school psychologist must be employed by a school district and that a school psychologist who is employed by one district may not practice as a school psychologist for a second district. However, there is nothing in section 2909 to support such assumptions. Because section 2909 does not preclude the District from contracting with school psychologists, either those who are not employed by a school district or those who are employed by another school district, Gallup's contention that the District may not do so is without merit.

On the basis of the foregoing analysis, we hold, as a matter of law, that there was no evidence to support the trial court's ruling that the District's

[8]Business and Professions Code section 2909 provides in relevant part: "Nothing in this chapter shall be construed as restricting or preventing activities of a psychological nature or the use of the official title of the position for which they were employed on the part of the following persons, provided those persons are performing those activities as part of the duties for which they were employed, are performing those activities solely within the confines of or under the jurisdiction of the organization in which they are employed and do not offer to render or render psychological services as defined in Section 2903 [licensure requirement] to the public for a fee, monetary or otherwise, over and above the salary they receive for the performance of their official duties with the organization in which they are employed: [¶] (a) Persons who hold a valid and current credential as a school psychologist issued by the California Department of Education."

replacement of its three elementary school psychologists by an administrative psychologist and independent psychologists was not a reduction or discontinuation of a "particular kind of service" pursuant to section 44955. Thus, we hold in turn that the ruling was error.

### DISPOSITION

The judgment is reversed. The Board's purported appeal from the order denying its motion for a new trial is dismissed.

McKinster, Acting P. J., and Richli, J., concurred.

A petition a for rehearing was denied February 22, 1996, and respondent's petition for review by the Supreme Court was denied April 25, 1996. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.