Opinion
 

 SILLS, P. J.
 

 Introduction
 

 It is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, contribution, co-obligation and joint tortfeasorship. Perhaps because the words describe legal relationships between multiple parties, they are vaguely reminiscent of complex mathematical equations which, after all, also describe relationships, except in numbers rather than words—and for most of us, they are about as easy to understand. Even lawyers find words like “indemnity” and “subrogation” ring of an obscure Martian dialect.
 

 For better or worse, the present case revolves around these ideas. We are required to unravel the rights of several parties—and their insurers—on a construction project where a worker was injured. The reader may therefore find it helpful to have, from the beginning, a mental diagram of the parties and their relationships. A general contractor named Tishman sits in the center. On one side there is a subcontractor named Buggy, and next to Buggy is its insurer Canadian. On Tishman’s other side is another subcontractor named Herrick, and next to Herrick is its insurer, Classic. Beneath all of them is the injured worker, an employee of Herrick’s, who sued both Tishman and Buggy. We will not attempt to describe our conclusions now, except to say that one must have some idea of the web of contractual obligations in which all five key players enmeshed themselves to know what is going on.
 

 Facts
 

 As this case comes to us after a demurrer was sustained without leave to amend, the facts are taken from the complaint and attached exhibits. We suspect there is much that lies hidden beneath the surface of the record. Here is what is visible:
 

 
 *757
 
 In April 1986 Herrick Corporation entered into a contract with the Tishman Construction Corporation to supply structural steel for the Tishman Executive Towers.
 
 [1]
 
 Herrick promised to guard its work and areas affected by its work to prevent personal injuries and indemnify Tishman from any liability Tishman incurred for bodily injury, unless the bodily injury was caused by the
 
 sole
 
 negligence or willful misconduct of Tishman.
 
 [2]
 
 The contract obligated Herrick to maintain comprehensive general liability (CGL) insurance with $10 million limits. The insurance was to list Tishman as an additional named insured. The contract further provided that the $10 million required insurance would not be construed as a limit on Herrick’s liability. Further, the CGL policy had to meet certain requirements, including deletion of the “other insurance” clause. The policy was to provide “primary” (as distinct from excess) liability insurance for Tishman.
 

 Three months later, in July 1986, C. E. Buggy also entered into a contract with Tishman, this one to supply and install metal decking for the project. This was essentially the same contract Herrick signed, with indemnification and insurance clauses identical to those in Herrick’s contract.
 
 [3]
 
 Herrick was insured by the Classic Syndicate of the Illinois Insurance Exchange, Buggy by the Canadian Insurance Company of California.
 

 In November 1986, during construction, one of Herrick’s employees was seriously injured when the metal decking on which he was standing collapsed. In October of the following year the employee and his wife sued Tishman, Buggy, Herrick and others.
 

 
 *758
 
 In August 1989 Herrick’s insurer, Classic, agreed to defend Tishman in the employee’s lawsuit.
 
 [4]
 
 Almost three years later, on June 3, 1992, Tishman requested a defense from Buggy. Within five days Buggy’s insurer, Canadian, agreed to defend Tishman without reservation. About that time Herrick (i.e., Classic) discontinued its defense of Tishman. Within a month—on July 2—Tishman filed a cross-complaint against Herrick for contractual indemnity. Despite having defended Tishman for nearly three years, Herrick and its insurer contended they had no duty to defend or indemnify Tishman.
 
 [5]
 

 On July 31 Tishman and Buggy agreed to settle with the injured employee for $125,000 and $25,000 respectively. Buggy’s insurance company, Canadian, paid both settlement funds. Herrick and Classic were not part of the settlement.
 
 [6]
 

 After a judicial hearing concluding the settlement between Buggy and the injured employee was in good faith, Tishman proceeded to trial on its contractual indemnity cross-complaint against Herrick. On August 19 the trial court awarded Tishman $125,000 plus fees and costs. Herrick’s insurer, Classic, then paid Tishman the full amount of the judgment.
 

 One week before the trial court’s decision, Herrick filed this action against Buggy and Canadian seeking partial reimbursement for amounts paid to Tishman as well as legal fees and costs incurred before Canadian accepted the tender of defense. A first amended complaint filed August 17 added Herrick’s insurer Classic as a plaintiff and deleted Buggy as a defendant. After Canadian filed a demurrer to this first amended complaint, Herrick and Classic requested leave to file a second amended complaint to reintroduce Buggy as a codefendant. Canadian also filed an opposition to this second amended complaint.
 

 The trial court sustained the demurrer without leave to amend. The judge stated he believed the good faith settlement dispositive. Plaintiffs’ request for leave to file a second amended complaint was denied. This appeal followed from the ensuing judgment of dismissal against Herrick and Classic.
 

 
 *759
 
 Discussion
 

 Classic
 
 v.
 
 Canadian
 

 As a matter of equity, insurers of the “same risk” may sue each other for contribution.
 
 (Fidelity etc. Co.
 
 v.
 
 Fireman’s F. I. Co.
 
 (1940) 38 Cal.App.2d 1, 4 [100 P.2d 364]; cf. Ins. Code, § 590 [“A double insurance exists where the same person is insured by several insurers separately in respect to the same subject and interest.”]) This right is not a matter of contract, but flows “ ‘from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.’ ”
 
 (Truck Ins. Exchange
 
 v.
 
 Torres
 
 (1961) 193 Cal.App.2d 483, 489-490 [14 Cal.Rptr. 408], quoting
 
 American Auto Ins. Co.
 
 v.
 
 Seaboard Surety Co.
 
 (1957) 155 Cal.App.2d 192, 195 [318 P.2d 84].) The idea is that the insurers are “equally bound,” so therefore they “all should contribute to the payment.”
 
 (Fidelity etc., supra,
 
 38 Cal.App.2d at p. 5.)
 

 In the present case, both Canadian and Classic are alleged to have shared the same risk, namely, Tishman’s liability for the injuries sustained by Herrick’s employee. Normally that would mean that Classic would have the right to pursue Canadian for contribution for amounts Classic paid that should have been paid by Canadian. The trial judge, however, sustained the demurrer to Classic’s contribution action because Canadian’s two insureds, Tishman and Buggy, had already settled in good faith with the underlying plaintiff.
 

 California’s good faith settlement law, sections 877 and 877.6 of the Code of Civil Procedure, provides a means for
 
 some
 
 settling litigants to insulate themselves from contribution claims.
 
 [7]
 
 Section 877 provides that where a dismissal is given in good faith before judgment to “one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights,” the dismissal shall discharge that party from all liability for contribution to any other parties. Section 877.6 provides that after a settling joint tortfeasor or coobligor on a contract debt successfully obtains the trial court’s imprimatur on the good faith of a settlement, that determination “shall bar any other joint tortfeasor or co-obligor” from prosecuting any further claims for “equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.”
 

 Nothing in the good faith settlement statutes suggests they apply to litigants other than “joint tortfeasors” (alternatively described as “tortfeasors
 
 *760
 
 claimed to be liable for the same tort”) or “co-obligors on a contract debt.” The question thus arises whether liability insurers fit either category.
 

 As to being joint tortfeasors, the answer is easy: obviously not. Insurers, in their role as insurers, do not commit the torts for which claimants seek to hold policyholders responsible.
 
 [8]
 
 In the present case, for example, neither Canadian nor Classic contributed to the actual conditions that resulted in Herrick’s employee being injured. As noted in
 
 Pacific Estates, Inc.
 
 v.
 
 Superior Court
 
 (1993) 13 Cal.App.4th 1561, 1571 [17 Cal.Rptr.2d 434], no reported decision has defined tortfeasor, as the word is used in the good faith settlement statutes, to include the
 
 insurer of
 
 a tortfeasor.
 

 That leaves the question of whether insurers of tortfeasors can be “coobligors on a contract debt.” (See § 877.6, subd. (a)(1).) We are aware of only two cases that have addressed this issue directly, both in the context of primary and excess insurance. The two cases conflict on the precise point of whether primary and excess insurers are “co-obligors,” but both are instructive.
 

 The first is
 
 Diamond Heights Homeowners Assn.
 
 v.
 
 National American Ins. Co.
 
 (1991) 227 Cal.App.3d 563 [277 Cal.Rptr. 906]. There, a homeowners’ association sued the developer and general contractor. A settlement included a large stipulated judgment to which three liability insurers (two primary and one excess) did not contribute.
 
 [9]
 
 The association then brought suit against the three noncontributing insurers to satisfy the balance of the stipulated judgment. The excess insurer obtained summary judgment on coverage grounds. The appellate court, as part of its discussion justifying reversal of that summary judgment, concluded primary insurers may in good faith negotiate settlements that invade excess coverage without the excess insurer’s consent, but that the excess insurer could present objections to the settlement at the good faith confirmation hearing.
 
 (Id.
 
 at pp. 580, 582.) The court then mentioned that if the trial court confirmed the good faith of the settlement, “the excess insurer stands in the position of a ‘co-obligor’ barred from making a claim of bad faith against the settling parties.”
 
 (Id.
 
 at p. 582.) It did not elaborate on what it meant by “stand in the position” of a co-obligor.
 

 
 *761
 

 Pacific Estates, Inc.
 
 v.
 
 Superior Court, supra,
 
 13 Cal.App.4th 1561 faced the problem more directly. As in
 
 Diamond Heights,
 
 a homeowner’s association sued a developer and general contractor, with those parties settling to provide for a large liability overhang that could only affect nonparticipating insurers. The parties sought confirmation of a good faith settlement, which the trial court
 
 denied.
 
 The court determined that, under
 
 Diamond Heights,
 
 the nonsettling insurers were “co-obligors” as the term is used in the good faith settlement statutes, and, taking their interests into account, the settlement was not in good faith.
 
 (Pacific Estates,
 
 13 Cal.App.4th at pp. 1566-1567.) After an extended discussion of
 
 Diamond Heights,
 
 the
 
 Pacific Estates
 
 court concluded the phrase “co-obligors on a contract debt” as used in the good faith settlement statutes referred to “parties to a contract dispute which itself is the subject of the underlying litigation.”
 
 (Id.
 
 at p. 1571.) And because the nonsettling insurers were not such “co-obligors,” it was error for the trial court, believing that they were co-obligors, to deny the writ. The good faith motion was sent back for reconsideration.
 
 (Id.
 
 at p. 1576.)
 

 A third case,
 
 Fireman’s Fund Ins. Co.
 
 v.
 
 Maryland Casualty Co.
 
 (1994) 21 Cal.App.4th 1586, 1594, footnote 7 [26 Cal.Rptr.2d 762], noted the split between the two decisions and stated that were it necessary for the court to reach the issue, it would “be inclined toward”
 
 Pacific Estates
 
 because “by definition a primary and an excess insurer are
 
 serial
 
 obligors on separate contracts, not co-obligors on
 
 a
 
 contract debt.” (Original italics.) The
 
 Fireman’s Fund
 
 court, however, hastened to added that the issue was “academic” under the facts before it.
 

 We are also spared the need to address the subtleties that revolve around the question of whether an excess insurer is a “co-obligor” on “a” contract with a primary insurer. Whatever the case may be between primary and excess insurers, there can be no doubt that between
 
 only primary
 
 insurers the respective obligations arise strictly out of separate contracts—hence they are not co-obligors on “a” contract debt (singular). While primary insurers may tailor their obligations in light of the existence of other primary insurance (e.g., other insurance clauses which purport to make them “excess” to any other insurance), the fact remains that primary insurance exists fundamentally independent of other insurance. That is, primary insurance will still be available regardless of whether some other insurer assumes the same risk (see Ins. Code, § 590 [defining “double insurance”]). That is not the case with excess insurance, which is
 
 predicated
 
 on the existence of underlying insurance.
 

 Because there is no basis to establish Classic was either a “joint tortfeasor” or “co-obligor on a contract debt” with Canadian, the good
 
 *762
 
 faith settlement law does not prevent Classic from suing Canadian for contribution.
 

 But that does not end the analysis. Classic’s $125,000 payment to Tishman was not made on behalf of the “same risk” that Canadian’s payment to the underlying plaintiffs was made. Classic has not paid any money to indemnify Tishman in Classic’s role as
 
 Tishman’s
 
 insurer. Rattier, Classic paid its money
 
 on behalf of Herrick.
 
 Its payment represented
 
 Herrick’s
 
 obligation to indemnify Tishman pursuant to the Herrick-Tishman contract. By contrast, Canadian paid its money
 
 on behalf of Tishman and Buggy,
 
 representing their exposure as joint tortfeasors to the underlying plaintiffs.
 

 The two risks are not the same. There is a difference between the risk that Herrick would be contractually liable to Tishman and the risk Tishman would be liable in tort to Herrick’s employee. The same injury might underlie each liability, but the legal nature of each liability is different. In Tishman’s case, it is direct liability in tort for the injuries sustained by a worker at a site over which Tishman, as general contractor, had control. In Herrick’s case, it is strictly a liability that could not exist but for a contract which obligated Herrick to pay for
 
 all
 
 of
 
 Tishman’s
 
 liability to the worker, regardless of Tishman’s respective fault, except that for which Tishman was
 
 solely
 
 responsible. After all, the injured worker was Herrick’s employee and Herrick was protected by the workers’ compensation laws from the worker’s direct tort claims against it.
 

 While Herrick’s contractual obligation to indemnify Tishman is insurable because it represents, fundamentally, a liability in “tort” (see e.g.,
 
 Fireman’s Fund Ins. Co.
 
 v.
 
 City of Turlock
 
 (1985) 170 Cal.App.3d 988, 998-1000 [216 Cal.Rptr. 796] [policyholder can assume tort liability of another by contract]), it was still
 
 Herrick’s
 
 liability, not Tishman’s, that required Classic to pay the $125,000. We therefore conclude that as to the $125,000, Classic has no basis to seek contribution from Canadian.
 

 The defense costs are different. For three years Classic financed Tishman’s defense. Because Classic was
 
 independently
 
 obligated to provide that defense to Tishman, who was an additional insured on Classic’s policy, Classic assumed a risk identical to that assumed by Canadian, which was also independently obligated. We cannot say as a matter of law at this point that Classic assumed Tishman’s defense merely on Herrick’s behalf. Classic may therefore prosecute a contribution claim against Canadian for (and only for) the defense costs it incurred defending Tishman, its mutual insured with Canadian. We express no opinion as to the effect, if any, on Classic’s claim by its having proclaimed, after it had spent almost three years defending
 
 *763
 
 Tishman, that it had no duty to do so. The parties have not raised that issue and we will leave it for another day.
 

 Classic
 
 v.
 
 Buggy
 

 While Buggy is not an insurance company, its promise to indemnify Tishman is, at least in the statutory sense, an insurance contract. (See Ins. Code, § 22 [“Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.”].) This leads to the inference that Buggy should be treated as an insurer along with Canadian and Classic and therefore, like Canadian, subject to an equitable contribution action as a co-insurer.
 

 The inference, however, should be resisted. Buggy is a subcontractor. Its contract is typical of those in the construction industry whereby one party (usually a subcontractor) promises to indemnify another (usually a general contractor) for any judgments entered against the latter for damages arising out of the former’s work. From the standpoint of the economic fundamentals—as distinct from the statutory definition of insurance—such contracts are more in the nature of promises to stand behind specifically identifiable work. Insurance contracts, on the other hand, cover generally defined sets of risks in exchange for a premium having (hopefully) some rational relationship to those risks.
 

 The one case of which we are aware that has squarely considered a contractor’s promise to indemnify in the context of an insurance contribution action held that construction contractors and insurers are not “co-insurers.”
 
 (Pylon, Inc.
 
 v.
 
 Olympic Ins. Co.
 
 (1969) 271 Cal.App.2d 643, 648 [77 Cal.Rptr. 72].) In
 
 Pylon,
 
 an engineering company contracted with the owner of a retirement community to provide plans and specifications for a sewage pump station; Olympic insured the engineering firm. The owner also contracted with a general contractor for the construction of the station. The general contractor promised to indemnify both the owner and the engineering firm from all claims for personal damages arising out of its work.
 
 (Id.
 
 at p. 646.)
 

 In the course of construction, a trench caved in, killing one of the general contractor’s employees and injuring another. The injured employee and the heirs of the other sued the owner and the engineering company. The engineering company, in turn, filed a cross-complaint against the general contractor, requesting, among other things, that the indemnity provisions of the contract should apply to any judgment the plaintiffs might recover against the engineering firm.
 

 
 *764
 
 At this point the general contractor filed its own cross-complaint against the
 
 insurer
 
 of the engineering firm requesting a declaration that, should the general contractor be held liable to the engineering company, its liability would extend “only for its equitable pro rata share as a co-indemnitor” with the insurance company. (271 Cal.App.2d at pp. 647-648.) The insurance company successfully moved for summary judgment, and the court entered a judgment striking the general contractor’s cross-complaint. On appeal, the court examined various theories which might breathe life into the general contractor’s cross-complaint, one of which was that the general contractor and the insurer were “co-insurers of the same risk.”
 
 {Id.
 
 at p. 648.) The court rejected the idea, giving these reasons:
 

 —the general contractor’s indemnity contract had “no monetary limit”;
 

 —it covered only claims arising out of the execution of the work covered by the contract;
 

 —it was given to the owner as well as the engineering firm;
 

 —it was part of a contract with the owner and had its inception when the contract with the owner originated; and
 

 —it was not given in consideration of a premium measured by the extent of the exposure. (271 Cal.App.2d at p. 648.)
 

 In contrast, the insurer’s policy
 

 —was “described as one of liability insurance covering the business operations of the insured”;
 

 —covered operations that were not limited to a single job;
 

 —contained the usual limits of liability. (271 Cal.App.2d at p. 648.)
 

 The court elaborated on the difference between the two litigants several paragraphs later, where it concluded the general contractor was “an indemnitor whose contract contain [ed] no limit of liability,” while the insurer was “an indemnitor whose obligation [was] limited” in amount. Because the two entities had not contracted to share the engineering company’s liability, there was “no basis” to prorate the amount of loss between them. (271 Cal.App.2d at p. 649.)
 

 Not all the points of difference between the general contractor and the insurer in
 
 Pylon
 
 are self-evident. The fact the general contractor’s obligation
 
 *765
 
 was part of a contract with the owner, while the insurer’s obligation was part of a contract with the engineering company, seems insubstantial. And the fact that a party is a beneficiary of a policy by virtue of being named an additional insured (i.e., the insurer’s obligation arises as part of a contract with a different party) does not qualitatively change the nature of the insurer’s obligation.
 

 Nevertheless, the basic difference on which the
 
 Pylon
 
 court seems to have relied the most—the difference between liability unlimited in amount, but limited to a given project, versus liability limited in amount, but indifferent to the project—seems sound. As mentioned above, the contractor’s promise in this context is essentially one of standing behind its work. It is not delving into the insurance business. It does not wager on the probabilities of certain kinds of losses in the face of historical data. Rather, it assumes the risk of injury on a specific jobsite because it has
 
 physical control
 
 over its work at that site. The contractor who promises to indemnify another party to a construction contract for losses arising out of its work does so because it, after all, will be on the job site and able to take actual measures to minimize the assumed risks. Insurers play a qualitatively different role. Buggy is therefore not an insurer subject to an equitable contribution action for having insured the same risk as Classic.
 

 What about a claim based on equitable subrogation? Equitable subrogation allows a “paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid.”
 
 (Fireman’s Fund Ins. Co.
 
 v.
 
 Maryland Casualty Co., supra,
 
 21 Cal.App.4th 1586, 1596.) This is a thorny question because Buggy plays two roles-in this drama of abstractions.
 

 On the one hand, Buggy is clearly a joint tortfeasor with Tishman and therefore should be able to avail itself of the good faith settlement statutes. On the other, Buggy is also a contract indemnitor. Its promise to indemnify Tishman is one of express indemnification, and the good faith settlement statutes do not bar claims based on
 
 express
 
 indemnification contracts. (See
 
 Bay Development, Ltd.
 
 v.
 
 Superior Court
 
 (1990) 50 Cal.3d 1012, 1032 [269 Cal.Rptr. 720, 791 P.2d 290].)
 

 However, as noted above, Classic did not pay $125,000 on Tishman’s behalf. It paid it on Herrick’s behalf by virtue of Herrick’s contract with Tishman. The payment on Herrick’s behalf could not subrogate Classic to any of Tishman’s rights against Buggy because Classic did not pay on Tishman’s behalf and Herrick’s obligation was based on Herrick’s own contract obligation to Tishman.
 

 
 *766
 
 Again, however, the defense costs incurred by Classic on
 
 Tishman’s
 
 behalf from August 1989 to June 1991 are a different matter. Tishman clearly had the right to be defended by Buggy, and that right—because it was based on an express indemnification contract between it and Buggy— could survive a good faith settlement.
 
 (Bay Development, Ltd.
 
 v.
 
 Superior Court,
 
 50 Cal.3d at p. 1029.) The record does not disclose whether
 
 Tishman
 
 expressly released
 
 Buggy
 
 of any claims to defense costs based on its contract with Buggy at the time of the settlement. If so, Classic would, of course, be subrogated to nothing.
 
 (Fireman’s Fund Ins. Co.
 
 v.
 
 Maryland Casualty Co., supra,
 
 21 Cal.App.4th at p. 1597 [subrogated insurer has no rights against third party who has been released by insured].) However, because it is possible (on this record) that Tishman’s express contractual right to be defended by Buggy was not released, Classic is subrogated to that right, which may yet have some value.
 
 [10]
 

 Herrick v. Canadian and Buggy
 

 As the preceding discussion shows, neither Herrick nor Buggy can be construed as insurers of Tishman. It follows that Herrick has no claim against Canadian based on it being a co-insurer of the same risk, even though both Herrick and Canadian promised indemnification to Tishman. Herrick therefore cannot state a claim for equitable contribution against Canadian.
 

 Nor does Herrick have a claim for equitable contribution against Buggy. Buggy did not, as explained above, assume the role of insurer. Its promise to indemnify Tishman was essentially one of standing behind
 
 its
 
 work rather than insuring Tishman against third party claims.
 
 California Food Service Corp.
 
 v.
 
 Great American Ins. Co.
 
 (1982) 130 Cal.App.3d 892 [182 Cal.Rptr. 67], relied on by Herrick, is inapposite. The case merely allowed equitable contribution between two fire insurers when a restaurant which both insured was damaged in a fire.
 

 As to subrogation, the $125,000 payment made by Herrick to Tishman (that is, by Classic on Herrick’s behalf) cannot be said to have been
 
 on behalf
 
 of
 
 Tishman.
 
 It merely represents the discharge of Herrick’s contractual obligation
 
 to
 
 Tishman. While Classic is subrogated to whatever rights Herrick retains against Tishman, the fact remains that under Herrick’s contract with Tishman, Herrick has no indemnity rights against Tishman. Herrick has not made any payments on Tishman’s behalf which would allow
 
 *767
 
 it to be subrogated to Tishman’s rights against Buggy. There is thus no basis for a subrogation claim by Herrick against Buggy.
 

 Conclusion and Recapitulation
 

 When the smoke clears, it is apparent there are only two viable claims in this case. First, Classic has a contribution claim against Canadian for Classic’s defense costs incurred on behalf of their
 
 mutual insured,
 
 Tishman. Second, Classic has a subrogation claim against Buggy for those defense costs, based on Classic’s subrogation to Tishman’s express contractual right to be defended by Buggy. The judgment is reversed to the extent that it precludes these claims and the case is remanded to allow Classic to amend its pleadings to state them.
 

 On the other hand, Classic has no claim against either Canadian or Buggy on any ground based on the money Classic paid on
 
 Herrick’s behalf
 
 to Tishman. And Herrick has no claims of any sort against either Canadian or Buggy. The judgment is affirmed to the extent it recognizes these conclusions.
 

 The moral to the story is that by opting out of defending and indemnifying Tishman when, at the last moment, Canadian stepped in to assume Tishman’s defense, Classic lost its chance to make indemnity payments on behalf of Tishman, a mutual insured, and was stuck with making its eventual indemnity payment on behalf of Herrick, which only it insured. In essence, Classic missed the opportunity to seek contribution for the indemnity money it eventually had to pay out on Herrick’s behalf by staying away from the table when the underlying case was being settled.
 

 In the interests of justice each party will bear its own costs.
 

 Sonenshine, J., and Crosby, J., concurred.
 

 A petition for a rehearing was denied November 28, 1994, and the opinion was modified to read as printed above. Appellants’ petition for review by the Supreme Court was denied January 19, 1995.
 

 [1]
 

 To be precise, the contract was with the property owner, the Tishman-Executive Life Orange Venture “acting by and through” Tishman Construction.
 

 [2]
 

 The contract styled Tishman-Executive Life and Tishman Construction as “Indemnitees,” and Herrick as the “Contractor.” Here is the pertinent language:
 

 “The Contractor agrees to indemnify and save harmless the Indemnitees against and from all claims, liabilities, damages, losses and expenses incurred by or imposed upon the Indemnitees for bodily injuries . . . sustained by any person or persons . . . however, such injuries may be caused, whether such claims, liabilities, damages, losses or expenses arise from or are caused directly or indirectly by (i) the negligence of the Contractor or any subcontractor of the Contractor, or the agents, servants, employees or contractors of either of them, in the performance of work under this contract, ... or (ii) the negligence (active and passive) of the Indemnitees, whether attributable to a breach of statutory or other legal duty or administrative regulation or otherwise, or (iii) bodily injuries and death for which liability is imputed to the Indemnitees, or (iv) any other manner; provided, however, that the foregoing indemnity shall not extend to a particular one of the Indemnitees in a case where such injuries are caused by the sole negligence or willful misconduct of such particular one of the Indemnitees.”
 

 [3]
 

 Buggy, however, was only required to maintain a $5 million insurance policy.
 

 [4]
 

 The complaint alleges that Herrick agreed to defend Tishman, but we assume its insurer Classic was actually paying the bills.
 

 [5]
 

 Because this case comes to us from a demurrer, we are not privy to the answers to such questions as why Tishman waited so long before requesting a defense from Buggy, why Canadian so quickly assumed Tishman’s defense after that request was made, and why Herrick (Classic) discontinued a defense it had undertaken for almost three years.
 

 [6]
 

 In a proposed second amended complaint in the within action, Classic alleges that
 
 it
 
 paid the $25,000. We assume that the allegation is just a mistake in view of Classic’s statement in its opening brief that
 
 Canadian
 
 paid all settlement funds, which makes sense because Canadian, not Classic, was Buggy’s insurer.
 

 [7]
 

 All further statutory references unless otherwise indicated are to the Code of Civil Procedure.
 

 [8]
 

 To be a joint tortfeasor an insurer would necessarily be acting outside its role of insurer. To give a highly contrived example: suppose an insurer owned an office building and at the same time insured a janitorial firm which negligently failed to clean up a coffee spill in that building, and as a result both the insurer and the firm were sued as joint tortfeasors for a consequent slip and fall. In this scenario the insurer is a joint tortfeasor by virtue of its role as the building’s owner, not as the janitorial firm’s insurer.
 

 [9]
 

 For a discussion of the relationship between primary and excess insurers, see
 
 Diamond Heights Homeowners Assn.
 
 v.
 
 National American Ins. Co., supra,
 
 227 Cal.App.3d at pages 575-579.
 

 [10]
 

 The question arises as to whether, by the same logic, Canadian could sue Herrick for the defense costs Canadian incurred in defending Tishman, based on it being subrogated to Tishman’s right to a defense from Herrick. We will also leave that one for another day.