[No. G018963. Fourth Dist., Div. Three. Jan. 28, 1999.]

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. et al., Plaintiffs and Appellants, v.
NATIONWIDE INSURANCE COMPANY et al., Defendants and Respondents.

710

**COUNSEL**

Schaffer & Lax, John H. Horwitz; and Marjorie E. Motooka for Plaintiffs and Appellants.

Daniels, Baratta & Fine and Mark R. Israel for Defendants and Respondents Nationwide Insurance Company and Craig Foss Insurance Services.

Demler, Armstrong & Rowland, Robert W. Armstrong, James Lemieux; and Michael W. Caspino for Defendants and Respondents Pangborn Plumbing Corporation.

**OPINION**

**CROSBY, J.**—An employee of a plumbing subcontractor slipped and fell during a "punch list" inspection on a high-rise construction project. The trial court made two separate factual findings based on the evidence: First, the general contractor was solely at fault; second, the general contractor's negligence did not arise out of its supervision of the subcontractor's work. Because there is sufficient evidence to support these findings, neither the subcontractor nor its liability insurer is required to indemnify the general contractor (either as an indemnitee or as an additional insured) for its $231,000 settlement of the underlying lawsuit.

I

In this challenge to the sufficiency of the evidence, we interpret the evidence and any conflicting inferences under the "very well settled" standards of substantial evidence review, which appellate courts have repeated

"countless times." (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

Roy Schain worked as a plumber for respondent Pangborn Plumbing Corporation. Pangborn was retained as the plumbing subcontractor for the construction of the 21-story Roybal Federal Building in downtown Los Angeles. Appellant Tutor-Saliba Corporation was the general contractor.

The accident happened on February 26, 1991, when the building was about 90 percent complete. Schain reported to his foreman, George Boddy, and was told to take care of some supposedly unfinished plumbing work on the 20th floor men's restroom. Schain said he already had completed it, but was directed to check it anyway: "Who knows, maybe someone has stolen a toilet or ripped something off the wall."

Schain stepped off the elevator on the 20th floor to find several inches of standing rainwater on a recessed concrete subfloor. The water had leaked through open portions of the roof during a recent rainstorm that had lasted several days. Despite previous complaints by Pangborn, Tutor-Saliba's practice was to allow the water on the upper levels of the building to evaporate rather than vacuum it up. Bill Best, Tutor-Saliba's project manager, acknowledged, "Certainly if the roof wasn't done, there would be water on several floors." He declined to do anything about it because, in his words, "I'm not their mother, you know. You can't go around telling people to be careful walking through water."

Schain walked about 100 feet through the ponded water before he stepped up to dry concrete and walked through the door of the men's room. But his shoes were still wet, and he slipped on the decorative marble threshold as he opened the door. He severely injured his right knee and sued Tutor-Saliba for negligence.

Tutor-Saliba was insured by National Union Fire Insurance Company. Pangborn was insured by Nationwide Insurance Company. Pangborn's subcontract contained a written indemnity provision requiring Pangborn to defend and indemnify Tutor-Saliba against any and all claims "arising out of or in any way connected with the performance of the subcontract work," including Tutor-Saliba's active negligence and excepting only losses caused by its "sole negligence." The subcontract also required Pangborn to name Tutor-Saliba as an additional insured by use of a standard endorsement found in Insurance Services Office (ISO) policies (ISO form G116) "or its equivalent," and that this policy be primary and noncontributing to Tutor-Saliba's own liability insurance. Nationwide's policy listed Tutor-Saliba as

an additional insured, but the language in the additional insured endorsement differed from the language in ISO form G116.

Tutor-Saliba tendered its defense to Pangborn and Nationwide but received no response. As a result National Union defended Tutor-Saliba and filed a declaratory relief action against Nationwide. Tutor-Saliba cross-complained in the underlying action against Pangborn for equitable and contractual indemnity and declaratory relief.

Shortly before trial on the underlying action, National Union settled by paying $231,000 to Schain and the workers' compensation carrier. By that time it had incurred some $17,469 in defense costs. The settlement did not resolve the indemnity cross-complaint against Pangborn, which was severed from the main action and consolidated with National Union's declaratory relief action.

On November 7, 1994, the parties, with court approval, consented to submit their dispute to a "binding arbitration . . . on the record and with all parties retaining their right to appeal." They chose a retired judge, Vernon Foster, as the "arbitrator" and submitted on deposition testimony and stipulated exhibits, including the subcontract, the additional insured endorsement, and several declarations.

The hearing before Judge Foster was held in January 1995, and he issued a 13-page written decision in April 1995. He determined that National Union was entitled to $17,469 for its defense costs but nothing on its $231,000 indemnity claim because Tutor-Saliba was solely negligent for Schain's injuries.

The parties subsequently realized the incongruity between a "binding" arbitration and a right to appeal. In September 1995, Nationwide suggested that the stipulation be modified nunc pro tunc "to constitute a reference by consent of the parties . . . ." There were no objections. In October 1995, the court (Judge Alfano) accepted the reference and adopted Judge Foster's findings of fact and conclusions of law "as the decision of the court, in its entirety." No party chose to file any posttrial motions. Instead, National Union and Tutor-Saliba directly appealed from the judgment.

## II

We preliminarily take up a matter that troubles us even though it apparently does not concern any of the parties: our jurisdiction to hear this appeal. The power to contract may go a long way, but parties cannot agree to create appellate jurisdiction that otherwise does not exist.

We reiterate our holding in *Old Republic Ins. Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 45 Cal.App.4th 631 [53 Cal.Rptr.2d 50]: There is *no* such creature as a "binding arbitration with a right to appeal." Arbitrations provide an *alternative* method of dispute resolution to legal proceedings. They follow different rules and serve different ends. They are as distinct in their elementary structure as dirt is to water. Mixing the two only produces mud—not the sort of stuff we willingly tread in.

Did the nunc pro tunc modification from "arbitration" to "reference" preserve our powers of appellate review? We conclude it did, but only because the proceedings conducted before Judge Foster constituted a "reference" in everything *but* name, and the proceedings before Judge Alfano constituted a "reference" in everything *including* name. Rather than altering history, the nunc pro tunc order served only to speak the truth of what was intended to happen and what actually did happen—" 'not to make an order now for then, but to enter now for then an order previously made.' " (*Hamilton v. Laine* (1997) 57 Cal.App.4th 885, 890 [67 Cal.Rptr.2d 407].)

While the form of the proceedings was denominated an arbitration, its substance was a reference—precisely as depicted in our dissenting colleague's appendix. A general reference, obtained with the parties' consent, empowers the referee "to try any or all of the issues . . . whether of fact or of law." (Code Civ. Proc., § 638, subd. 1.) It must be voluntary and arises by agreement. (*Murphy v. Padilla* (1996) 42 Cal.App.4th 707, 714 [49 Cal.Rptr.2d 722] ["A trial court's nonconsensual general reference constitutes an unconstitutional abdication of judicial authority."].)

There are several reasons why the nunc pro tunc order is sustainable under the circumstances of this case. First, the parties *all* agreed the nunc pro tunc order reflected their true intent to submit the dispute for a general reference. Most tellingly, Nationwide, as the prevailing party, had everything to gain by insisting that Judge Alfano's award be treated like an arbitration, confirmed by the trial court and subject to highly limited review on appeal. Yet it was Nationwide which proposed the nunc pro tunc modification and which repeated the point in its opening brief. Obviously, it would have served its interests to dismiss the appeal on jurisdictional grounds. Its decision not to do so serves as a powerful indicator of the parties' intent.

Second, Judge Foster preserved the necessary legal formalities in conducting the proceedings. He acted as if higher powers were looking over his shoulder, and he provided something for Judge Alfano (and ultimately for us) to look at. The hearing was reported and conducted according to the rules

of evidence and California substantive law. This was not a freewheeling, improvisational proceeding. Instead, the initial reference and the subsequent judgment spoke in the language of the law, thereby permitting meaningful appellate review.

Third, the nunc pro tunc modification came in time to preserve the power of the trial court to independently review the decision of the "referee." Unlike the situation in *Old Republic*, the modification did not purport "to cut out the middleman: the trial judge." (*Old Republic Ins. Co.* v. *St. Paul Fire & Marine Ins. Co., supra,* 45 Cal.App.4th at p. 638.) To the contrary, Judge Alfano independently reviewed Judge Foster's findings and issued his own decision as the judgment of the court. The reference preserved the court's power regarding new trial motions and other postjudgment remedies. As a result, we are not asked to assume functions which constitutionally are assigned to trial judges in the first instance.

A cautionary note—we spend too much time trying to make sense out of arbitration agreements precisely because litigants spend too little time in drafting them. Increasingly, we have been presented with incoherent hybrids and bizarre mutations of supposed agreements for judicial or contractual arbitration. Oftentimes the "remedy" is worse than the disease. We can only warn: Read the label before applying.

In this, we strongly agree with the admonitions voiced by Justice Rylaarsdam in his dissent. As he suggests, the best way to deal with history's mistakes is to change the future, not rewrite the past. In rectifying legal or judicial errors involving the merits, nunc pro tunc orders have no role whatever.

### III

Pangborn's duty to indemnify Tutor-Saliba depends on the words of the contract, as understood in their ordinary and popular sense, as a measure of the parties' mutual intent. (*Continental Heller Corp.* v. *Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 504 [61 Cal.Rptr.2d 668].) Here, the subcontract clearly intended to utilize an "express" or "Type I" category of indemnity agreement, within the three categories set out in *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 419-421 [105 Cal.Rptr. 725]. This obligates Pangborn to indemnify Tutor-Saliba even for

the latter's own active negligence so long as Tutor-Saliba's liability arises out of Pangborn's performance of the subcontract work.[1]

There is one exception: There is no indemnity for losses caused by Tutor-Saliba's sole negligence or willful misconduct. This exception comports with a statutory prohibition against allowing an indemnitor to hold harmless an indemnitee for the indemnitee's sole negligence in construction contracts. (Civ. Code, § 2782.) It is against California public policy for a general contractor to use its economic clout to preemptively transfer the risks of its own sole negligence to fault-free subcontractors. Such indemnity, the reasoning goes, would increase the risk of accidents by removing the general contractor's incentive to undertake accident-prevention measures involving its own negligence to avoid a risk of harm to third parties.

The sole negligence exception is precisely where the court found Tutor-Saliba's fault to lie. We see no legitimate reason to overturn this factual finding. Because the evidence is not so clear and undisputed that reasonable persons could not disagree, the issue is one of fact, not law.

There was sufficient evidence to support the finding of sole negligence. As the court stated, "the fault of Tutor Saliba is obvious." It took inadequate remedial action to address the hazards of the ponded rainwater by tarping the exposed roof, pumping the ponded water, or better coordinating its subcontractors' work schedules. It unreasonably allowed the water to remain on the floors for a week or longer, assuming the subcontractors would work around the problem and exercise care to avoid injury.

Substantial evidence also supported the court's finding that Schain himself was free from fault even though the ponded water presented an open and obvious condition. The court reasonably concluded: "Although it is correct that the ponded water was obvious to him, there is no evidence of an available alternate route. He was confronted with the choice of continuing through the water or abandoning his trip to inspect the bathroom until the water evaporated naturally, a week or two later. It was not unreasonable for him to elect the first option." As appellants themselves observed in their

---

[1]Section 4 of the subcontract agreement provides as follows: "[Pangborn] agrees: . . . (c) To indemnify, defend and save harmless [Tutor-Saliba] from and against any and all claims . . . of any kind at any time arising out of or in any way connected with the performance of the subcontract work . . . including the active or passive negligence of [Tutor-Saliba]. This clause will apply, but not be limited, to . . . [c]laims relating to personal injury and wrongful death including claims by Subcontractor employees or their heirs and representatives. . . . [¶] This Section shall not indemnify [Tutor-Saliba] from loss, damage or expense caused by the sole negligence or wilfull misconduct of [Tutor-Saliba]."

arbitration brief, "The evidence appears to indicate that [the worker] was not advised about the condition on the 20th floor prior to being sent there."[2]

Appellants contend there was evidence of concurrent negligence by Pangborn because the injured worker's supervisor knew there was water on the 20th floor. They also rely on cases like *Jones* v. *McFarland Co-Op Gin, Inc.* (1965) 237 Cal.App.2d 94 [46 Cal.Rptr. 572] to argue that any finding of negligence by Tutor-Saliba must be imputed to Pangborn because Pangborn had a coequal duty to provide a safe place to work. (See also *Scott* v. *John E. Branagh & Son* (1965) 234 Cal.App.2d 435 [44 Cal.Rptr. 384]; and *Conner* v. *Utah Constr. & Mining Co.* (1964) 231 Cal.App.2d 263 [41 Cal.Rptr. 728].)

Not only are appellants' cases distinguishable on their facts, but they were so distinguished in *Souza* v. *Pratico* (1966) 245 Cal.App.2d 651, 661-662 [54 Cal.Rptr. 159]. *Souza* dismissed the identical argument: "The above three cases, however, do not stand for the proposition that where there is liability on the general contractor it must inexorably follow that liability shall coexist against the subcontractor-employer. [¶] An examination of the three cited cases discloses that in each the direct and immediate employer was concurrently negligent *under the particular facts of the respective case.*" (*Id.* at p. 660.)

We do not decide what reasonable inferences should be drawn from the evidence. Suffice it to say, there was substantial evidence that Tutor-Saliba was in sole control of the area on the 20th floor where the flooding occurred, and it could have prevented or ameliorated the water hazards. Pangborn had finished its work there about a week earlier, and had no reason to anticipate its employees would be called upon to return.[3]

---

[2]At oral argument, appellants' counsel argued that Schain was contributorily negligent as a matter of law because he chose to wear boots which had been recently resoled, rather than rubber-soled boots. We are unsure of the significance of such a fact-laced assertion, but it does show counsel took the concept of "sole" negligence to literal extremes in order to compel Pangborn (and Nationwide) to foot the bill. In any event, we know of no rule that holds "unless the shoe is dry, you must indemnify"; it is neither our function nor our inclination to step into such obviously factual disputes.

Because we decline to second-guess the court's factual determination that no contributory negligence existed, we need not resolve the purported conflict between *C.I. Engineers & Constructors, Inc.* v. *Johnson & Turner Painting Co.* (1983) 140 Cal.App.3d 1011 [189 Cal.Rptr. 824] and *Southern Pacific Transportation Co.* v. *Sandyland Protective Assn.* (1990) 224 Cal.App.3d 1494 [274 Cal.Rptr. 626].

[3]Tutor-Saliba's project manager, Bill Best, could not identify any acts or omissions by Pangborn that caused the accident. He testified: "Q: Based on your own personal knowledge at this time, you don't have any criticism whatsoever of Pangborn Plumbing with respect to

IV

Separate from the written indemnity provision, appellants argue that Tutor-Saliba was entitled to a defense and indemnity as an additional insured under the Nationwide policy. Such a status, if applicable, would free Tutor-Saliba from relying on the Type I indemnity clause (and its statute-based "sole negligence" exception), and allow it to independently secure a defense and indemnity directly under the Nationwide insurance policy. (*Herrick Corp.* v. *Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 762 [34 Cal.Rptr.2d 844].)

This requires us to examine the contractual language and intent in two separate documents: (1) the subcontract between Pangborn and Tutor-Saliba with its independent covenant for a ISO form G116 endorsement "or its equivalent," and (2) the additional insured endorsement actually contained in the Nationwide policy.[4]

Appellants only halfheartedly raise Tutor-Saliba's entitlement to coverage as an additional insured under the Nationwide policy. The endorsement contains highly restrictive language requiring Tutor-Saliba to be "held liable" for Pangborn's acts or omissions in order to qualify as an additional insured. The court found Tutor-Saliba's liability for the settlement was not caused by Pangborn's negligence. We agree. (*Maryland Casualty Co.* v. *Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 30 [76 Cal.Rptr.2d 113] ["held liable" clause in additional insured endorsement limits coverage "where the subcontractor's negligence is attributed to [the general contractor] but has no application where [the general contractor's] own alleged negligence is at issue"].)

Appellants virtually admitted in their arbitration brief that the "held liable" language in Nationwide's endorsement strictly tied their status to

the plaintiff's slip-and-fall incident? [¶] A: Well, I'm not quite sure of what you mean [but] . . . [a]s far as Pangborn is concerned, they were a responsible subcontractor . . . managed their people well, and were a safe contractor."

[4]Nationwide's additional insured endorsement provides, "WHO IS AN INSURED (Section II) is amended to include [Tutor-Saliba] as an insured . . . [but] only to the extent that [it] is *held liable* for [Pangborn's] acts or omissions arising out of and in the course of operations performed for [Tutor-Saliba] by [Pangborn] or [Pangborn's] subcontractor." (Italics added.)

The court was furnished with an exemplar of an ISO form G116 additional insured endorsement, which provided: "The 'Persons Insured' provision is amended to include [Tutor-Saliba] as an insured . . . but only with respect to liability arising out of (1) operations performed for the additional insured by the named insured at the location designated above or (2) acts or omissions of the additional insured in connection with its general supervision of such operations. . . . This insurance does not apply: . . .[¶] to **bodily injury** or **property damage** arising out of any act or omission of the additional insured or any of his employees, other than general supervision of **work** performed for the additional insured by the named insured."

their vicarious liability for Pangborn's misdeeds: "[T]he additional insured endorsement did not provide the breadth of coverage for Tutor-Saliba that was required by the Subcontract Agreement. . . . [¶] [W]hereas Nationwide's additional insured endorsement is limited to liability of Pangborn's acts or omissions for which Tutor-Saliba may be held liable, the endorsement required by Tutor-Saliba provides coverage for the operations of Pangborn as well as Tutor-Saliba's acts or omissions in connection with its general supervision of Pangborn's operations."

Ultimately this is a distinction without a difference. Even the supposedly more comprehensive ISO form G116 endorsement (which Pangborn failed to secure) still only required additional insured coverage for Tutor-Saliba's "general supervision" over Pangborn, not for its own independent acts or omissions. ■ We interpret policy language in its full context, in accordance with its clear language and, where necessary, consistent with an insured's objectively reasonable expectations. (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 45 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

■ The court made a factual determination that Tutor-Saliba's liability arose solely from the failure to prevent the accumulated rainwater, *not* from its general supervision over Pangborn's operations. (See, e.g., *Liberty Mut. Ins. Co.* v. *Capeletti Bros., Inc.* (Fla.Dist.Ct.App. 1997) 699 So.2d 736, 738 ["[t]he plain meaning of this language does not provide [the general contractor] coverage for its acts of negligence that do not constitute supervision of [the subcontractor's] work"].)

This interpretation of the additional insured endorsement furthers California's interest in preventing construction-related accidents. While Civil Code section 2782 does not directly affect the validity of additional insured endorsements (which serve distinctly different purposes than contractual indemnity provisions) it still reflects policy considerations that apply to how broadly courts construe them. As one commentator explained, "[i]n the ordinary insurance relationship, the insured is . . . deterred from engaging in risky activity by the notion that an accident or occurrence will result in the insurer raising its premiums. [But] the additional insured is insulated against this prospect by the fact that it is not responsible for premium payments to the insurer and is unaffected by the raising of premiums. . . . [T]here is no motivation or incentive for the additional insured to exercise a high standard of care." (Mehta, *Additional Insured Status in Construction Contracts and Moral Hazard* (1996) 3 Conn. Ins. L.J. 169, 186-187, fns. omitted; cf. *Tanns* v. *Ben A. Borenstein and Co.* (1997) 293 Ill.App.3d 582 [227 Ill.Dec. 974, 688 N.E.2d 667, 671-672].)

Tutor-Saliba could have insisted upon a broader additional insured endorsement with no language limiting coverage to its derivative liability based on its failure to supervise Pangborn's acts. (See, e.g., *Acceptance Ins. Co. v. Syufy Enterprises, Inc.* (1999) 69 Cal.App.4th 321 [81 Cal.Rptr.2d 557] [additional insurance endorsement extends coverage to property owner for any injuries to subcontractor's employee while on its premises to perform work].) In *Acceptance,* unlike here, the additional insured endorsement apparently lacked any limiting language like the "general supervision" provision in the promised ISO form G116 endorsement. ██ As the court stated, "Insurance companies are free to, and commonly have, issued additional insured endorsements that specifically limit coverage to situations in which the additional insured is faced with vicarious liability for negligent conduct by the named insured." (*Id.* at p. 330.)

██ Indeed, Tutor-Saliba, a sophisticated and highly knowledgeable litigant, raised no objections to the "held liable" coverage actually obtained by Pangborn. Under all these circumstances, the court did not err in denying any indemnity obligations based on the additional insured endorsement either promised or provided. Appellants cannot be heard to complain since Tutor-Saliba was fully protected for its negligence under its liability policy with National Union, whose premium structure was directly related to Tutor-Saliba's loss history, thereby affording strong incentives for safety.[5]

## V

██ Because Pangborn has not cross-appealed from that portion of the judgment requiring it to pay defense costs of $17,469, Tutor-Saliba seeks additional attorney fees as the prevailing party under the attorney fees provision in the subcontract. (Civ. Code, § 1717.) Nationwide objects because Tutor-Saliba did not proceed "by noticed motion as required by the statute." (Civ. Code, § 1717, subd. (b)(1).)

Tutor-Saliba has waived any claim to attorney fees by failing to timely pursue it below. (*Bankes* v. *Lucas* (1992) 9 Cal.App.4th 365, 370-371 [11

---

[5]Appellants' strident references to Nationwide's "bad faith" failure to defend unnecessarily distract from the appeal. Tutor-Saliba was not left without a defense or an indemnity. To the contrary, National Union stepped in and fulfilled the very roles for which it received policy premiums. This dispute between insurance carriers is little served by co-opting rhetoric which more aptly applies to insureds who are left without any insurer-provided defense. (See *Ceresino* v. *Fire Ins. Exchange* (1989) 215 Cal.App.3d 814, 823 [264 Cal.Rptr. 30].)

Moreover, Nationwide's duty to pay defense costs arises (if at all) from Pangborn's breach of its contractual duty to secure the promised ISO form G116 endorsement, not because Nationwide breached any defense obligation in the additional insured endorsement. Nationwide has not cross-appealed from this aspect of the judgment, which implicates a different form of coverage (for contractual liability).

Cal.Rptr.2d 723].) During the hearing the referee deferred any attorney fee claim until after it determined the indemnity and breach of contract issues. Tutor-Saliba raised no objection: "[THE REFEREE]: I gather that the plaintiff's position is that they are entitled to attorney's fees for this proceeding by reason of the contract? [¶] MR. HORWITZ: Yes. [¶] . . . [THE REFEREE]: Why don't we simply hold up until afterwards, and . . . if you are the prevailing party on the contract issue and they can do the same; and then you'll have an opportunity to file an objection to parts of them or whatever you feel is not appropriate. [¶] MR. KING: Certainly seems the wiser approach."[6]

Tutor-Saliba never filed a motion for attorney fees, nor did it object to the referee's award or the subsequent judgment that each party bear its own fees. Consequently, the issue of attorney fees cannot be raised at this time.

The judgment is affirmed. Respondents are entitled to their costs on appeal.

Wallin, Acting P. J., concurred.

**RYLAARSDAM, J.,** Dissenting.—I disagree with my colleagues that we have jurisdiction to hear this appeal. The appeal is from an arbitration award, where the parties purported to confer jurisdiction on the Court of Appeal, first by way of their agreement to conduct binding arbitration "retaining their right of appeal," and later by way of a nunc pro tunc order which purports to memorialize that something happened which in fact did not occur. Parties cannot by their agreement create appellate jurisdiction where none exists. (*Old Republic Ins. Co.* v. *St. Paul Fire & Marine Ins. Co.* (1996) 45 Cal.App.4th 631, 639 [53 Cal.Rptr.2d 50].) Nunc pro tunc orders operate to correct the record to reflect what actually transpired; not to change the past or to record that something happened which did not. (*Hamilton* v. *Laine* (1997) 57 Cal.App.4th 885, 890-891 [67 Cal.Rptr.2d 407].)

Except for certain nunc pro tunc orders which are statutorily authorized, primarily in the Family Code (see, e.g., Fam. Code, § 2346), such orders are essentially limited to correcting clerical error. (*Hamilton* v. *Laine, supra,* 57 Cal.App.4th at pp. 890-891.) "The court can only make the record show that something was actually done at a previous time; a nunc pro tunc order cannot declare that something was done that was not done." (7 Witkin, Cal.

---

[6]The matter was brought up again at the hearing's conclusion: "[THE REFEREE]: Remember, as far as the costs of this action are concerned, I thought we had concluded that we'd wait and see whether it's going to be, who is going to prevail on the contract issue. [¶] MR. HORWITZ: That's fine, Your Honor. We did agree to that."

Procedure (4th ed. 1997) Judgment, § 63, p. 591, italics omitted, citing *City of Los Angeles* v. *Superior Court* (*Peters*) (1968) 264 Cal.App.2d 766, 771 [70 Cal.Rptr. 826].) Such an order is not a time machine permitting courts to return to the past and retroactively change history.

Here the parties entered into an arbitration agreement. After the arbitration was completed, the nunc pro tunc order purported to transmogrify the agreement and the already completed proceedings into a general reference. This was not a situation where the parties had agreed to and did participate in a general reference but, through a clerical error, the record erroneously reflected an agreement to arbitrate. This was not merely a correction of the record but rather a retroactive change in the parties' agreement and in the already completed proceedings. Contractual arbitrations and general references are not identical or even similar proceedings. I have attached an appendix which demonstrates major differences between the two types of proceedings. Because of these significant differences we must conclude that these are distinct proceedings. It is inappropriate to ignore the distinctions and to pretend there was a reference when the parties clearly intended to and did participate in an arbitration.

I would find the nunc pro tunc order to be invalid and ineffective. Therefore this appeal is from an arbitration award and hence not an appealable judgment.

724

APPENDIX

Comparison of Contractual Arbitration to General Reference

(Unless otherwise indicated, all statutory references are to the Code of Civil Procedure; Citations to the Practice Guide are to Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1997))

| CONTRACTUAL ARBITRATION | REFERENCE |
| --- | --- |
| 1. Contractual agreement (§ 1281) | 1. Judicial Process (§ 639) |
| 2. Parties give arbitrator the power top decide their dispute (Practice Guide, ¶ 5:6) | 2. Scope of referee's power determined by the court (§ 638) |
| 3. Parties submit controversy to arbitrator (Practice Guide, ¶ 5:6) | 3. Court orders reference (§ 639) |
| 4. Parties determine qualifications of arbitrator (Practice Guide, ¶ 5:24) | 4. Statute determines qualifications of referee (§ 641) |
| 5. Parties choose and appoint arbitrator (§ 1280, subd. (d)) | 5. Parties choose referee, court appoints (§ 640) |
| 6. Parties determine number of arbitrators (Practice Guide, ¶ 5:24) | 6. Court determines number of referees up to three (§ 640) |
| 7. No court file is opened upon submission of dispute to arbitrator | 7. Court file is opened when stipulation or petition is presented to the court (Practice Guide, ¶ 6:165) |
| 8. Arbitration may be private (Practice Guide, ¶ 5:65) | 8. Court may order that reference be open to the public and notice to the public is required (Cal. Rules of Court, rule 244.1(c) and (d); Practice Guide, ¶ 6:213) |

9. Arbitrator not bound by law in reaching his award (Practice Guide, ¶ 5:65)

9. Reference must make finding based on laws of the court ordering reference (Practice Guide, ¶ 6:209)

10. Parties determine if rules of evidence apply (§ 1282.2, subd. (a)(2)(F)(d))

10. Rules of evidence apply (Evid. Code, § 300)

11. Arbitrator issues award to parties (§ 1283.4)

11. Referee submits a finding of fact and law stated separately to the court (§ 643)

12. Parties may petition the court to confirm the award and enter a judgment (§ 1285)

12. Finding of the referee stands as the decision of the court (§ 644)

13. Limited judicial review (§ 1286.2)

13. Review by appeal or by motion for new trial (§ 645)