[No. C029036. Third Dist. Sept. 21, 1999.]

CITY OF SHASTA LAKE et al., Plaintiffs, Cross-defendants and Respondents, v.
COUNTY OF SHASTA et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post*, page 5.

4

**COUNSEL**

Karen Keating Jahr, County Counsel; Kronick, Moskovitz, Tiedemann & Girard, Michael F. Dean; Brickwood, Olmstead & Underwood and James M. Underwood for Defendants, Cross-complainants and Appellants.

Moss & Enochian and John Sullivan Kenny for Plaintiffs, Cross-defendants and Respondents.

OPINION

**BLEASE, Acting P. J.**—This is an appeal from a judgment in cross-actions for declaratory relief concerning the rights and obligations of the parties arising under conditions imposed on the approval of incorporation of a new city.

The City of Shasta Lake (the City) and the Shasta Lake Redevelopment Agency (the City RDA) filed an action seeking declaratory relief concerning the conditions of incorporation, naming as defendants the County of Shasta (the County) and the Shasta County Redevelopment Agency (the County RDA). The County in turn cross-complained for declaratory relief and breach of contract concerning similar issues.

The parties stipulated that a retired superior court judge, Judge James E. Kleaver, would try the matter under the rules of evidence applicable to a trial by the court and that his decision "will have the same force and effect as a Superior Court judgment and will be appealable as such." The superior court approved the stipulation. The stipulation characterizes this arrangement as "binding arbitration [of] all issues raised in the complaint." Judge Kleaver rendered a decision in favor of the City, filed as a judgment in the action, which apportions the property tax revenue between the City and the County and provides for the payment of the costs of services arising out of the incorporation of the City.

The County appeals from the judgment.

In the published portion of this opinion[1] we decide we have appellate jurisdiction as this is de facto an appeal from a judgment of a temporary judge under California Constitution, article VI, section 21. Accordingly, we use the term "trial court" in referring to the actions of Judge Kleaver.

On the merits, we decide the trial court correctly construed an incorporation condition, condition Y, requiring payments from the City RDA to the County measured in part by "the amount of property taxes actually generated within the boundaries of the new city . . . ." The trial court construed this provision to mean the net property tax benefit accruing to the County from the new city territory, after deducting the property tax revenues diverted to the state and adding revenues which replaced the diverted property tax revenues (the replacement revenues).

We also decide the trial court correctly determined the City's payment for services provided the City by the County during the first year of incorporation should be offset by the replacement revenues retained by the County

---

[1]The Reporter of Decisions is directed to publish the opinion except for part IV of the Discussion.

which would have been allocated to the City pursuant to Government Code section 30054[2] had it been incorporated in the 1993-1994 fiscal year.

In the unpublished portion of the opinion we find merit in the claim the City owes interest for amounts due under the contract for services the County rendered the City.

We will reverse the judgment insofar as it denies interest to the County. In all other respects we will affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

We begin with a brief survey of the Cortese-Knox Local Government Reorganization Act of 1985 (Cortese-Knox Act), a detailed statutory scheme which governs, inter alia, the incorporation of new cities. (§ 56000 et seq.) It vests authority in the local agency formation commission (LAFCO) in each county (§ 56325) to approve a proposal for the incorporation of a city within the county.[3] (§§ 56375, 56021.)

In passing on a proposal LAFCO determines the property tax to be exchanged by the affected local agencies pursuant to section 56842. (See also § 56375, subd. (q).) Under section 56842 a county must allocate to the new city a portion of the property taxes collected by the county measured by the ratio (the Assessor's ratio) of all such taxes to the total amount of revenue available for general purposes times the total net cost of county services which the new city will assume. (§ 56842, subd. (c)(1)-(3).) This is called the "base year amount." In effect the new city is allocated an amount which is less than the cost of services it will assume.

LAFCO may impose conditions on the approval of an incorporation as prescribed in section 56844, including for example, the transfer of property, payments for the transfer of property, and the allocation of debt. (§ 56843.) If LAFCO determines the current expenditures made by the county for services assumed by the new city are not substantially equal to the current revenues received by the county that would otherwise accrue to the city, it can approve the proposal if either: (1) the county and all of the "subject agencies" (see §§ 56077, 56021) agree or (2) the negative fiscal effect on the county is adequately mitigated by terms and conditions under section 56844. (§ 56845, subd. (c)(1), (2).)

In 1992, the Shasta County LAFCO (the Shasta LAFCO) began proceedings pursuant to the Cortese-Knox Act to incorporate the City. The Shasta

---

[2] References to a section are to the Government Code unless otherwise indicated.

[3] The LAFCO consists of two members chosen by the county, two by the existing cities. These members then select a fifth member. (§ 56325.)

LAFCO approved the incorporation predicated on the following pertinent conditions, among others: (1) the County provides services within the newly incorporated territory for the remainder of the 1993-1994 fiscal year or until the City takes action to discontinue the services; (2) the City pays for such services at the County's net cost (see § 57384, subd. (b)); (3) the property tax revenue to be transferred to the City is $685,000, except as adjusted by condition W.

Condition W was adopted in anticipation the Legislature would enact legislation to transfer property taxes from the County to the State of California (the State). It provides the base year amount should be reduced proportionally if the State reduces the property tax revenue to the County derived from the City territory for the fiscal years 1991-1992 through 1993-1994 without providing actual replacement revenues. Condition W also specifies an adjustment for property taxes transferred to the State for a prior fiscal year, 1991-1992, in the amount of $36,000.

The Shasta LAFCO approved the incorporation of the City with these conditions. The fiscal analysis accompanying the approval noted that as a result of the transfer of the obligation to the City to pay for services formerly assumed by the County there would be a net gain to the County general fund of approximately $200,000 per year. For that reason it said that "[b]ased on the cost and revenue estimates contained in [the fiscal analysis] the incorporation more than meets this criterion of fiscal neutrality" under section 56845. It concluded: "Since LAFCO relied on the agreement reached by the two parties [the County and the public utilities district], rather than on strict fiscal neutrality, the Commission did not require that the County benefit be reduced."

After the initial approval of incorporation, at the request of the County the Shasta LAFCO reconsidered its approval and imposed condition Y. Condition Y calls for a written agreement between the County and a predecessor to the City, the Shasta Dam Area Public Utilities District (the PUD), consistent with an attached document entitled "Conceptual Agreement Between County of Shasta and Shasta Dam Area Public Utility District." The conceptual agreement, inter alia, acknowledges the creation of the City RDA and its assumption of the obligations of the County RDA.[4] It calls for the payment by the City RDA to the County of the difference between the "property tax base transfer amount" and "the amount of property taxes actually generated within the boundaries of the new city and allocated to the new city." The conceptual agreement says the purpose of the payment is to reimburse the

---

[4]Condition X provides that "Jurisdiction over the Redevelopment Project may be transferred to the new city pursuant to the Health and Safety Code."

County "for the cost of certain specified public improvements constructed in the redevelopment project area by the County if territorial jurisdiction over the redevelopment project is transferred to the redevelopment agency of the new city."

However, contrary to the fiscal analysis, it also recites that the condition provides "a mechanism whereby the negative fiscal effect of the reorganization on the county, measured by the amount of property tax losses resulting to the County from the exchange of property tax revenues for the incorporation in excess of the amount of property taxes actually generated within the city and allocated to the city, will be fully mitigated."

The County and the PUD entered into a mitigation agreement (the Mitigation Agreement). It provided the new City RDA shall reimburse the County for public improvements, constructed in the new City territory by the County RDA, in annual payments measured by the amount by which the "property tax base transfer amount" exceeds "the amount of property taxes actually generated within the boundaries of the new city . . . ." It deleted the phrase "and allocated to the new city" contained in the conceptual agreement.[5]

On March 8, 1993, the Shasta LAFCO again approved the incorporation, subject to the Mitigation Agreement and the City succeeded to the PUD.

Disputes arose concerning the meaning of conditions and the rights and obligations of the City and the County. This litigation was commenced. Thereafter the parties stipulated, in pertinent part, as follows. They submitted to "binding arbitration [of] all issues raised in the complaint and cross-complaint" before "Retired Siskiyou County Superior Court Judge James Kleaver." The arbitration would be conducted under "the rules of evidence applicable to a trial by court . . . ." "[T]he decision of Judge Kleaver will

---

[5]The Mitigation Agreement provides in pertinent part: "In order to fully mitigate the negative fiscal effect of the proposed incorporation on the County, generally measured by the amount of property tax losses to the County from the exchange of property tax revenues for the incorporation, the Redevelopment Agency of the County shall reimburse the County for the cost of certain specified public improvements constructed in the redevelopment project area by the County if and when territorial jurisdiction over the redevelopment project is transferred to the redevelopment agency of the new city. This payment obligation would be assumed by the [City RDA] by operation of law if and when it assumes jurisdiction over the redevelopment project. The payments shall be made on an annual basis . . . and shall be equal to the difference between (a) the property tax base transfer amount determined by LAFCO in accordance with [section] 56842, and (b) the amount of property taxes actually generated within the boundaries of the new city. Such payments shall discontinue when the amount of property taxes paid to the new city during the preceding fiscal years equals or exceeds the property tax transfer amount as determined by LAFCO."

be binding on all parties and filed with the Superior Court and will be treated as a judgment and will have the same force and effect as a Superior Court judgment and will be appealable as such."

A trial was conducted pursuant to this stipulation. During the proceedings various stipulations and case management reports were filed in Superior Court of Shasta County. Following the trial a "Judgment Following Arbitration," signed by Judge Kleaver, was filed in the action in the superior court.

The evidence adduced shows that, as anticipated, in both fiscal years 1992-1993 and 1993-1994, the Legislature transferred local property tax revenues from the County to the State to balance the state budget. In 1993 this revenue reduction was alleviated partially by the passage of Proposition 172, which established a .5 percent sales tax to be used for public safety services by local agencies. (Cal. Const., art. XIII, § 35.) The County and the City agreed, and the trial court found that, for purposes of condition W, the Proposition 172 funds were "actual replacement revenues." The funds replaced approximately 70 percent of the property taxes transferred to the State. Accordingly, they were used in determining the "property tax base transfer amount." The County and the City stipulated the Proposition 172 moneys were replacement revenues and would be retained by the County.

The trial court construed "property tax revenues actually generated within the City" in the Mitigation Agreement to mean the amount of such property tax revenue minus the net amount of revenue transferred to the State. In determining the net amount, it offset the amount of property taxes transferred to the State by the Proposition 172 replacement revenues.

The trial court ruled inter alia that:

"5. . . . For fiscal year 1997-98 and thereafter, except as provided in paragraph 6 . . . , the County's Proposition 172 related payment shall continue to be that amount representing (i) the percentage of the total property tax revenue shifted from the County's gross property tax revenues to the Education Revenue Augmentation Fund ('ERAF') that is replaced by Proposition 172 revenues received by the County, (ii) to be multiplied by the total gross amount of the City property tax revenues shifted to ERAF from gross collections within the City for each affected year."

"6. . . . The City and the County shall share future property tax growth, or property tax increment, equally in accordance with Condition 'V' . . . , including real property tax and Proposition 172 sales tax growth otherwise to be paid to the City, and the City RDA mitigation payments pursuant to

LAFCO Condition 'Y' shall not be required, when net property taxes from collections within the City that are apportioned to the City, plus Proposition 172 related revenues to be transferred to the City, equal or exceed $655,164 . . . ."

The County appeals from the judgment entered and filed by Judge Kleaver pursuant to the stipulation.

## DISCUSSION

### I

### *The Arbitration Agreement Provides for a Trial by the Court*

In view of the characterization of the stipulation for trial before Judge Kleaver as an arbitration agreement we asked the parties to brief the question of appellate jurisdiction.

The parties suggest the matter may be treated as an appeal from a judgment following a trial to the court and seek review of the merits of the decision in that light. We agree with the parties.

Our jurisdiction depends upon the status of the "Judgment Following Arbitration," filed in the superior court. Only if it is a judgment do we have jurisdiction. (See Code Civ. Proc., § 904.1.)

A paper filed in an action does not become a judgment merely because it is so entitled; it is a judgment only if it satisfies the criteria of a judgment. A judgment is a judicial act and must be rendered by a judge. (See 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 44, pp. 575-576.) An arbitration award is not a judgment; one must petition the court to confirm the award in order to obtain a judgment. (See Code Civ. Proc., §§ 1285, 1287.4.)

However, just as the decision of Judge Kleaver does not become a judgment merely because it was called that, it may be a judgment notwithstanding that the parties called it a "Judgment Following Arbitration." The appeal from the judgment is proper if Judge Kleaver can properly be characterized as a temporary judge and his decision a judgment entered after a court trial by a temporary judge. That turns on whether the proceeding meets the criteria of a temporary judge proceeding.

California Constitution, article VI, section 21 provides: "On stipulation of the parties litigant the court may order a cause to be tried by a temporary

judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause." A judgment entered by a temporary judge is a judgment subject to appeal.[6] (See 2 Witkin, Cal. Procedure *supra,* Courts, § 353, pp. 423-424.)

The parties commenced this litigation in the Superior Court of Shasta County. They are parties litigant. They stipulated for a decision of all the issues in the proceeding by a retired superior court judge after discovery and a hearing conducted under the rules of evidence that would apply at a court trial. They stipulated Judge Kleaver's decision would have the effect of a judgment after a court trial and would be subject to appeal on that basis. The superior court ordered the stipulation into effect. From all that is made to appear, this satisfies the remaining criteria of a court order on a stipulation that "a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."

The law aspires to respect substance over formalism and nomenclature. (See, e.g., Civ. Code, § 3528; see generally, *In re Marriage of Assemi* (1994) 7 Cal.4th 896 [30 Cal.Rptr.2d 265, 872 P.2d 1190], calling a similar situation a "hybrid" and *Kauffman* v. *Shearson Hayden Stone, Inc.* (1982) 128 Cal.App.3d 809, 811 [180 Cal.Rptr. 566], same terminology, affirming as a judgment retired judge's award of costs.)[7] Despite the fact the parties labeled their proceeding an arbitration, we treat it as a temporary judge proceeding.

---

[6]A temporary judge must take the oath of office, which is mandatory. (2 Witkin, Cal. Procedure (4th ed. 1996) Courts, § 354, p. 425.) We grant the request of the City for judicial notice that Judge Kleaver had taken the oath of office. (See Cal. Const., art. VI, § 6, permitting assignment of retired judges by the Chief Justice, without requiring that they be sworn.)

[7]In *In re Marriage of Assemi, supra,* 7 Cal.4th 896, the Supreme°Court held that in a judicially supervised marital dissolution proceeding, the parties' oral stipulation for settlement of the dispute, which had been presented to a retired judge acting as an appointed arbitrator, was "before the court" within the meaning of Code of Civil Procedure section 664.6.

The case commenced as an ordinary family proceeding but "pursuant to the parties' oral stipulation, made before [a sitting judge of the Superior Court], the court (1) bifurcated the issue[s] . . . , entered a judgment of dissolution of the marriage, and (2) ordered trial of the remaining issues . . . referred to binding arbitration' " before a retired judge. (7 Cal.4th at p. 901.) The court viewed the retired judge acting as an arbitrator as a "temporary judge" within the meaning of article VI, section 21 of the California Constitution. (7 Cal.4th at p. 901.) The court said: "In the present proceedings, the role served by Judge Meyers pursuant to the stipulation and order corresponded more closely to the functions and characteristics of a temporary judge than to those of an arbitrator. The stipulation and order contemplated that the proceedings would be governed by the rules and procedures applicable in superior court trials, and that Judge Meyers would render a decision having the same finality and subject to the usual appellate review accorded a judgment rendered by a superior court" notwithstanding the record failed to show that Judge Meyers took an oath of office empowering him to act as a temporary judge. (*Id.* at p. 908.) "Instead, as reflected by the stipulation and order, the parties

We conclude the decision of Judge Kleaver is a judgment from which the parties may appeal.

## II

### *The Trial Court Did Not Err in Determining the Proposition 172 Payments Retained by the County Must Be Treated as Property Tax Revenues for Purposes of Condition Y*

, ■ The County challenges the trial court's finding the share of Proposition 172 sales tax allocations attributed to the City territory and retained by the County should be considered as "property taxes actually generated within the boundaries of the new city" in determining the mitigation payment required under condition Y. The question is the proper construction of the language of the Mitigation Agreement.[8] As appears we discern no error in the resolution of that question by the trial court.

The effect of condition Y is to lower the base year amount paid by the County to the City. The reduction is the amount by which the property tax base transfer amount (the base year amount) exceeds "the amount of property taxes actually generated within the boundaries of the new city . . . ." It can be seen that the larger the latter amount the smaller the reduction in the base year amount.

The County argues that by allowing consideration of the Proposition 172 payments as property tax revenues, the trial court improperly rewrote the Mitigation Agreement to provide the payment due the County is: "the difference between (i) the property tax base transfer amount determined by LAFCO in accordance with Government Code Section 56842, and (ii) the amount of property taxes actually generated within the boundaries of the new city plus any 'actual replacement revenue recognized under Condition

---

contemplated that Judge Meyers would serve in some hybrid capacity not clearly consistent with either the position of a temporary judge . . . or that of an arbitrator under the private arbitration statutes." (*Id.* at p. 909.)

The court concluded that the role of Judge Meyers "was closely analogous to that of a judge, in a judicial proceeding, empowered to exercise what are essentially judicial functions. . . . [¶] For these reasons," the court said "Judge Meyers was empowered to act in a quasi-judicial capacity as arbiter of the controverted issues, and was acting in that capacity in approving the stipulated settlement presented to him." "Under these circumstances the parties' oral stipulation must be deemed to have occurred in a '*judicially supervised*' proceeding." (*In re Marriage of Assemi, supra,* 7 Cal.4th at p. 909, original italics.)

[8]We note that no party challenges the validity of any of the conditions imposed by the Shasta LAFCO on the incorporation and we imply no view on such questions as, e.g., whether approval of an incorporation can be conditioned upon a payment to mitigate a so-called negative fiscal effect of section 56842 requiring an amount of property tax revenue transfer in excess of the amount of property taxes actually generated in the territory of the new city.

W.' " (Emphasis added by County.) The County argues the language of both the Mitigation Agreement and condition Y is clear and unambiguous, and the calculation of the amount to be paid to the County refers only to actual property taxes, not to property taxes plus replacement revenues.

In ascertaining the meaning of written language we consider the text and context. We ascribe meaning based on the text and the purposes that were apparently to be achieved, in light of the circumstances. Unfortunately, in this case, the purposes to be achieved by condition Y and the derivative mitigation agreement are unclear. The text of the conceptual agreement annexed to condition Y says the payment is called for to reimburse the County "for the cost of certain specified public improvements constructed in the redevelopment project area by the County . . . ." However, there is nothing in the record which explains how the cost of these improvements (which have not been specified in the record), is reasonably compensable by the payment formula. The only suggestion of the source of the payment formula is the statement that the purpose of the payment is "to fully mitigate the negative fiscal effect of the proposed incorporation on the County, generally measured by the amount of property tax losses resulting to the County from the exchange of property tax revenues . . . ." Nor does the record show how condition Y meshes with the statement in the fiscal analysis that the County fiscally benefited from the incorporation and that "LAFCO relied on the agreement reached by the two parties [the County and the PUD], rather than on strict fiscal neutrality . . . ." The effect of condition Y was to lower the amount which the County would pay the City.

The County's request for a plain reading of the phrase "the amount of property taxes actually generated within the boundaries of the new city" is ironic. Read literally, the phrase would require that all of the property taxes actually generated in the territory be subtracted from the base year amount, including those taxes diverted to the State. This would result in a lower payment by the City to the County than that proposed by the City.

The County implicitly adds a qualification "and retained by the County." But this is the circumstance which led to the explicit provision of condition W that directed a reduction in the base year amount if the State reduces the property tax revenue to the County derived from the City territory for the fiscal years 1991-1992 through 1993-1994 without providing actual replacement revenues.

Since making sense of the text requires the implication of a qualification in condition Y in light of the State diversion of property tax revenue, the content of the implicit qualification is in play. The court must determine

whether the measure of the payment is the amount of property taxes which the County retains, as the County contends, or the amount of property tax *benefit* which the County receives, i.e., the property tax retained by the County plus replacement revenue given in lieu of property tax diverted by the State.

Since the declared purpose of the payment is to mitigate the so-called negative fiscal effect occasioned by property tax losses resulting from the incorporation, the City's candidate is the more reasonable. There is no incremental negative fiscal effect on the County attributable to the diversion of property tax revenue by the State to the extent that it receives either property taxes or replacement revenues.

## III

### *The Cost of Services*

Section 57384 provides that a county "shall" continue to furnish services to the previously unincorporated area for the remainder of the fiscal year during which incorporation occurs or "until the city council requests discontinuance of the services, whichever occurs first." If the county requests reimbursement, the city must pay the county the net cost of the services. (§ 57384, subd. (b).) "Net cost" is defined as the "total direct and indirect expense to the county of providing services . . . less any revenues which the county retains that were generated from the formerly unincorporated territory during the period of time the services are furnished . . . ." (§ 57384, subd. (b).)

Consistent with section 57384, LAFCO condition G required the County to "furnish to the incorporated area all services furnished to the area prior to incorporation for the remainder of the fiscal year during which the incorporation becomes effective or until the city council requests discontinuance of the services, whichever occurs first." Condition G also states: "If the city desires any increase in the level of such services during the fiscal year in which incorporation becomes effective or if the city desires continuation of such services in subsequent years, it shall enter into a mutually acceptable agreement with the County to obtain the desired increases in service levels and/or continuation of services."

LAFCO further required that the payments for services be made in four annual installments, and that interest be paid on the amount owing at the rate of interest equivalent to the rate of interest earned by the Shasta County treasury pool.

Approximately one month after incorporation, the City and the County entered into a law enforcement services agreement (LEA). The LEA provided the City would pay the entire cost of the services specified under the agreement. The LEA called for payments to be made quarterly. It contained no provision for interest on unpaid amounts.

LAFCO incorporated the terms of section 57384 into the resolution approving incorporation subject to conditions G and H. These conditions state:

"G. The Board of Supervisors shall continue to furnish to the incorporated area all services furnished to the area prior to incorporation for the remainder of the fiscal year during which the incorporation becomes effective or until the city council requests discontinuance of the services, whichever occurs first. If the city desires any increase in the level of such services during the fiscal year in which incorporation becomes effective or if the city desires continuation of such services in subsequent years, it shall enter into a mutually acceptable agreement with the County to obtain the desired increases in service levels and/or continuation of services.

"H. The new city shall reimburse the County for the net costs of the services provided pursuant to the first sentence of Condition 'G.' . . ."

The LEA became effective August 1, 1993, just one month after incorporation. It increased the services to be provided by the County Sheriff's Department.[9] It provided the City would pay the County the entire cost of providing services under the agreement, despite the fact that by statute the County could only charge the City for the net cost of services during fiscal year 1993-1994 unless the City requested a discontinuance of the services.

The County rendered the services specified in the written agreement, but the City maintains it is entitled to a credit for the revenues generated from the City territory and retained by the County. In other words, the City maintains it should only be required to pay the net cost of services. The County claimed the terms of the LEA, not section 57384, control and that the

[9]The trial court described the LEA as follows: "Following voter confirmation, incorporation became effective July 2, 1993. In the meantime, County and City had negotiated, and had entered into, an agreement (Exhibit M) effective July 27, 1993, for County to provide law enforcement services to City beginning August 1, 1993. This agreement provided for an enhanced level of services beyond that level County was obligated to provide under section 57384. The agreed level of law enforcement services in the prior fiscal year was approximately $850,000. The enhancements added approximately $300,000 in services, and included such services as traffic control, added personnel and equipment, a Sheriff's substation within the city area, and some degree of City input into policy matters as those matters might impact the new city area."

County was entitled to be paid the entire cost rather than the net cost of services.

The trial court found in favor of the City, allowing the City to credit the revenues it generated during fiscal 1993-1994 against the amount owed the County for services. In reviewing extrinsic evidence of the parties' intent, the trial court found "that responsible personnel for both sides had little real awareness of the impact of the agreement . . . ."[10]

The issues on appeal with regard to payment for services are: (1) whether the City is entitled to pay only the net cost of services, i.e., to set off tax revenues generated within the city for the remainder of fiscal year 1993-1994; (2) whether Proposition 172 funds should be included in any such set-off; and (3) whether the County is entitled to interest under the LEA.

A.

*The Net Cost of Services*

■ On appeal the County argues the LEA had the same effect as a request for discontinuance of services by the city council. Therefore, the County argues, the setoff provisions of section 57384 and conditions G and H were no longer effective. The County further argues the services were not rendered pursuant to section 57384, but pursuant to the LEA, thus the setoff provisions of section 57384 are not applicable.

The statute forms the backdrop against which the contract must be construed. "Generally, all applicable laws in existence when an agreement is made necessarily enter into the contract and form a part of it, without any stipulation to that effect, as fully as if they were expressly referred to and incorporated in its terms. [Citation.]" (*Grubb* v. *Ranger Ins. Co.* (1978) 77 Cal.App.3d 526, 529 [143 Cal.Rptr. 558].) Our construction of the contract necessarily must take into consideration the terms of the applicable statute— section 57384. We thus construe "entire cost" to mean "entire cost as allowed by statute." In this case, that amount is the net cost for fiscal year 1993-1994.

---

[10]County argues that the trial court violated the parol evidence rule when it allowed evidence regarding the intention of the parties with respect to the offsets against the cost of services. However, the issue before the trial court (as well as this court) was the interpretation of the language of the contract, a matter distinct from the application of the parol evidence rule. The interpretation of a contract involves ascertaining the meaning of the parties attached to the terms of the contract. The parol evidence rule determines whether prior or contemporaneous agreements will supplement and become a part of the contract. (5 Corbin, Contracts (1998 rev. ed.) § 24.11, p. 104.) We are concerned here with what the parties intended when they provided the City would pay for the entire cost of services.

Although both the statute and the LAFCO conditions allow the City to opt out of the payment-for-services scheme set forth in section 57384 before the end of the initial fiscal year, they provide the City must request that the County discontinue services. There is no such request in the LEA and we do not view the LEA as operating as a request for discontinuance. Instead, the LEA provided for a continuation of the same services as well as the addition of new services.

The County cites cases which have construed the term "discontinuance of service" under the Education Code to include situations where the same service continued to be performed by different personnel. These cases (*Gallup* v. *Board of Trustees* (1996) 41 Cal.App.4th 1571 [49 Cal.Rptr.2d 289]; *Fuller* v. *Berkeley School Dist.* (1934) 2 Cal.2d 152 [40 P.2d 831]) hold that a school district's right to terminate an employee because of a "discontinuance" of a "particular kind of service" includes situations in which some, but not all of the terminated employee's duties are continued by another employee. These cases are not analogous.

In light of the statutory background and the surrounding circumstances, we interpret the phrase "entire cost" in the LEA as it applies to fiscal year 1993-1994 to mean net cost as defined by section 57384.

B.

*Proposition 172 Funds Are Included As an Offset*
*in the Net Cost of Services*

■ The County claims the trial court erred in allowing the City to include Proposition 172 revenues in the amount the City could offset against the payment under the LEA for fiscal year 1993-1994.

The County maintains the City was not entitled to any portion of the Proposition 172 revenues and should not be allowed to "hijack" the revenues by way of setoff, that Proposition 172 revenues are not generated from the City because they are not allocated on the basis of situs, that the County did not retain the revenues as required by statute because it had no such revenues prior to the City's incorporation, and that the term "revenue" as used in section 57384 must be construed with reference to section 56842, which excludes special purpose revenue.

We disagree. Whether·or not the City was entitled to Proposition 172 revenues under the implementing statutes because it was not a city at the pertinent time, section 57384, subdivision (b), provides the cost of services

to the City, which the County is obligated to pay, shall be offset by "any revenues which the county retains that were generated from the formerly unincorporated territory during the period of time the services are furnished . . . ." This language includes Proposition 172 revenues. Such revenues were "generated" in the formerly unincorporated territory even though the allocation of Proposition 172 revenues is not situs based. Proposition 172 revenues are allocated to cities according to the amount of property tax revenue diverted to the Educational Revenue Augmentation Fund. (§ 30054.) This is a calculable amount, and is an amount generated by the City.

We reject the County's argument the word "retained" connotes a receipt of the revenues during a previous year. "Retained" simply means funds held by the County and not turned over to the City for whatever reason. Were the County to pay the funds to the City, they would not be retained and the City would have no right to offset such amounts from the payment for services.

It is not true, as the County contends, the term "any revenues" in section 57384 is the equivalent of the term "revenue from all sources available for general purposes" in section 56842. The County has not made a convincing argument the Legislature intended the terms to mean the same thing, or that logically the terms should be so interpreted. It is true, as the County states, that section 57384 makes reference to section 56842, but the reference is to the calculation of the expense of providing services, not the amount of revenues attributable to the City.

As originally enacted, section 57384 required a county to furnish services to the new city for the remainder of the fiscal year of incorporation and made no provision for payment to the county for services rendered. (Stats. 1985, ch. 541, § 3, p. 2014.) Shortly before the Legislature amended section 56842 to exclude special purpose revenue from the property tax allocation scheme (Stats. 1986, ch. 956, § 1, p. 3331), it amended section 57384 to allow the County to demand payment for the net cost of providing services. (Stats. 1986, ch. 700, § 1, pp. 2338-2339.)

In light of the different language employed by the two amendments, we shall assume that had the Legislature intended that "any revenues" exclude revenues "required to be used for a specific purpose" (§ 56842, subd. (c)(1)(A)) it would have used words to that effect. (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227]; *Rideout Hospital Foundation, Inc.* v. *County of Yuba* (1992) 8 Cal.App.4th 214, 221 [10 Cal.Rptr.2d 141]; *Poway Unified School Dist.* v. *Chow* (1995) 39 Cal.App.4th 1478, 1483 [46 Cal.Rptr.2d 651].)

## IV

### *The County Is Entitled to Interest**

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed to the extent it does not require the City to pay interest on the amount it owed for services the County was obligated to render pursuant to section 57384 in fiscal year 1993-1994. The City does not owe interest on any amount owed for services specified in the LEA, but not required under section 57384. The amount owed shall take into consideration the offset due the City for revenues retained by the County consistent with this opinion. In all other respects the judgment is affirmed. City of Shasta Lake and Shasta Lake Redevelopment Agency shall recover their costs on appeal.

Raye, J., concurred.

**NICHOLSON, J.**—I respectfully dissent from the decision of the majority because we lack jurisdiction to review the merits of this case. I disagree with the majority that, despite the parties' obvious failure to obtain an appealable judgment, the appeal should be rescued.

Embroiled in a dispute concerning the formation of a new city and the consequential sharing of revenue, the plaintiffs (City of Shasta Lake and the Shasta Lake Redevelopment Agency) and defendants (the County of Shasta and the Shasta County Redevelopment Agency) agreed to binding arbitration. When arbitration was completed, the arbitrator's decision was filed in the trial court. The defendants attempt to appeal from that nonappealable decision. Since we have no jurisdiction to hear the matter, we should dismiss the appeal.

The parties entered into a stipulation for binding arbitration, using retired Judge James E. Kleaver as the arbitrator, and obtained the signature of Judge Richard A. McEachen ordering the case to "arbitration pursuant to the stipulation[]." The stipulation stated: "[T]he decision of Judge Kleaver will be binding on all parties and filed with the Superior Court and will be treated as a judgment and will have the same force and effect as a Superior Court judgment and will be appealable as such."

During arbitration, the parties filed case management statements apprising the trial court of the status of the case. When arbitration was completed, the

---

*See footnote 1, *ante*, page 5.

plaintiffs filed a document entitled "Judgment Following Arbitration." This document was signed by Judge Kleaver. The defendants filed a notice of appeal, specifying the document filed over Judge Kleaver's signature as the judgment from which the appeal was taken.

The right to appeal is purely statutory. (*Jackson* v. *Jackson* (1945) 71 Cal.App.2d 837, 839 [163 P.2d 780].) The parties cannot create appellate jurisdiction by stipulation where none exists statutorily. (See *Four Point Entertainment, Inc.* v. *New World Entertainment, Ltd.* (1997) 60 Cal.App.4th 79, 82 [70 Cal.Rptr.2d 82].)

"There is *no* such creature as 'binding arbitration with a right to appeal.' Arbitrations provide an *alternative* method of dispute resolution to legal proceedings. They follow different rules and serve different ends. They are as distinct in their elementary structure as dirt is to water. Mixing the two only produces mud—not the sort of stuff we willingly tread in." (*National Union Fire Ins. Co.* v. *Nationwide Ins. Co.* (1999) 69 Cal.App.4th 709, 715 [82 Cal.Rptr.2d 16], italics in original (hereafter *National Union*).)

In their supplemental briefing, the parties assert the document filed over the signature of Judge Kleaver is an appealable judgment. They do this, however, only by characterizing the stipulation to arbitrate as something it is not.

A similar situation arose recently in the Fourth District. (*Old Republic Ins. Co.* v. *St. Paul Fire & Marine Ins. Co.* (1996) 45 Cal.App.4th 631 [53 Cal.Rptr.2d 50] (hereafter *Old Republic*).) The *Old Republic* court introduced the appellate jurisdiction issue as follows:

"Several alternative dispute resolution procedures result in decisions by quasi-judicial officers which are subject to varying scopes of judicial and appellate review. Depending upon the nature of the procedure adopted, these range from no judicial review to plenary review.

"Common alternative dispute resolution procedures are judicial and con-tractual arbitration and references to a special master. Judicial arbitrations are governed by Code of Civil Procedure section 1141.10 et seq. [this and other unspecified code references are to the Code of Civil Procedure] and California Rules of Court, rule 1600 et seq.; contractual arbitrations by section 1280 et seq.; and references by section 638 et seq. Although not usually categorized as alternative dispute resolution, we need also consider whether [Judge Kleaver] acted as a 'temporary judge.' Such judicial officers are authorized to perform judicial functions pursuant to California Constitu-tion, article VI, section 21 and their powers are governed by California Rules

of Court, rule 244. Such a temporary judge has the power to render a judgment which is appealable in the same manner as one rendered by a constitutional judge. [Citation.]

"After a judicial arbitration, a dissatisfied litigant is entitled to a trial de novo. (§ 1141.20, subd. (b).) Following such a trial on the merits, parties have the same rights of appeal as in all other cases tried in the superior court. However, absent a timely request for a trial de novo, the arbitration award constitutes a final, nonappealable judgment. (§ 1141.20, subd. (a).)

"The scope of judicial review of the decisions of contractual arbitrators is delimited in *Moncharsh* v. *Heily & Blase* [(1992)] 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899]: ' "The merits of the controversy between the parties are not subject to judicial review." ' (*Id.* at p. 11, quoting *O'Malley* v. *Petroleum Maintenance Co.* (1957) 48 Cal.2d 107, 111 [308 P.2d 9].) Since one of the reasons for this rule is that 'it vindicates the intentions of the parties' (*Moncharsh* v. *Heily & Blase, supra,* 3 Cal.4th at p. 11), the issue arises whether a contrary intention of the parties, as expressed in the stipulation herein, overrides the general rule. We consider this issue below.

"Review of the decision of a referee or special master [following a reference] is governed by section 644. The decision of the referee, unless objected to under section 645, is treated as a decision of the court, and 'judgment may be entered thereon in the same manner as if the action had been tried by the court.' (§ 644.) Such a judgment is subject to appeal in the same manner as any other judgment.

"We therefore need to determine whether the stipulation constituted an agreement for the appointment of a temporary judge, for judicial or contractual arbitration, or for reference by a special master." (*Old Republic, supra,* 45 Cal.App.4th at pp. 635-636, fn. omitted.)

In *Old Republic*, the parties filed a document entitled, "Stipulation For Binding Arbitration Before Special Master." However, the terms "arbitration" and "special master" were mutually inconsistent. Accordingly, the trial court inspected the remainder of the document to determine what type of dispute resolution resulted from the stipulation. (45 Cal.App.4th at p. 636.) Viewing the stipulation as a whole, the *Old Republic* court determined that the parties intended that the dispute be resolved by arbitration. (*Id.* at p. 638.)

The stipulation presented in this proceeding is different from the stipulation in *Old Republic* in several ways. The title unambiguously states the

dispute is to be resolved in binding arbitration. There are only two types of arbitration: contractual and judicial. If it was contractual arbitration, we cannot review directly the arbitrator's decision. We would review only the trial court's decision concerning the award (for example, confirming, modifying, or vacating the award). (Code Civ. Proc., § 1286 et seq.; further unspecified code references are also to the Code of Civil Procedure.) If it was judicial arbitration, no review is available. The defendants had to request a trial de novo to preserve review rights. (§ 1141.20, subd. (a).)

The majority concedes "[a]n arbitration award is not a judgment; one must petition the court to confirm the award in order to obtain a judgment. (See Code Civ. Proc., §§ 1285, 1287.4.)" (Maj. opn., *ante*, at p. 10.) I agree. Such an award is never a judgment until it is reduced to a judgment following the statutory procedure summarized above. (See *Rubin* v. *Western Mutual Ins. Co.* (1999) 71 Cal.App.4th 1539, 1545 [84 Cal.Rptr.2d 648].) The statutory procedure was not utilized here. Thus, there is no judgment.

The only statement in the parties' stipulation calling into doubt their intention to arbitrate this case is found in the statement that the decision of the arbitrator would be "filed with the Superior Court and will be treated as a judgment and will have the same force and effect as a Superior Court judgment and will be appealable as such." In all other respects, the stipulation is a common agreement to arbitrate.

Faced with a similar situation, the parties in another case recognized the ineffectiveness of their agreement that an arbitration award would be appealable. (*National Union, supra,* 69 Cal.App.4th at pp. 715-716.) Instead of urging the appellate court to rescue the appeal, the parties acted in the trial court to modify the agreement nunc pro tunc to be a reference agreement. The trial court entered the agreement as an order, treated the arbitration as a reference proceeding, and entered judgment on the arbitration order as if it had been a statement of decision from a referee. Even though the parties and trial court went to such effort, the Court of Appeal was still hesitant to acknowledge appellate jurisdiction. However, since the arbitration had effectively become a reference proceeding, the court decided the appeal on the merits. (*Ibid.*) Blatantly missing in the proceeding at bar is any effort to transform the arbitration into anything other than an arbitration. Instead, the parties ask us to extend our jurisdiction to hear the matter.

The parties make three arguments in favor of appealability. They argue: (1) the arbitration agreement conferred appellate jurisdiction on this court, (2) the arbitration agreement was, in reality, a reference under section 638, and (3) the arbitration agreement was, in reality, an appointment of a

temporary judge. None of these arguments is supported by the facts of this case. Instead, it is clear the parties entered into an agreement for binding arbitration, as the agreement states.

First, the parties claim that, since the arbitration agreement provides for a final judgment and appeal from the final judgment, this court has appellate jurisdiction. As stated above, however, the parties cannot create appellate jurisdiction by stipulation where none exists statutorily. (See *Four Point Entertainment, Inc.* v. *New World Entertainment, Ltd., supra,* 60 Cal.App.4th at p. 82.) The only ways to obtain review of an arbitrator's decision are after vacation, modification, or confirmation by the trial court (in the case of contractual arbitration) or after a trial de novo (in the case of judicial arbitration).

The parties argue that the arbitration agreement resulted in a reference proceeding under section 638. Under that section, "[a] reference may be ordered upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes or in the docket, or upon the motion of a party to a written contract or lease which provides that any controversy arising there-from shall be heard by a reference if the court finds a reference agreement exists between the parties . . . ." (*Ibid.*) At oral argument, the appellants indicated this was their preferred method for rescuing the appeal.

There is no mention of a reference proceeding anywhere in the parties' stipulation, in the other filings, or in the interactions between the court and the parties. As noted, it was agreed that the dispute was to be resolved through arbitration.

The parties argue that finding this was an arbitration agreement exalts form over substance. The remainder of the record, however, belies this argument.

The trial court did not appoint Judge Kleaver as a referee. (§ 640.) While in the arbitration agreement, the parties "agree[d] to use" Judge Kleaver, the trial court did not enter an order appointing Judge Kleaver. This is consistent with an arbitration agreement because in arbitration it is unnecessary for the court to appoint an arbitrator when one is chosen by the parties.

Furthermore, the trial court did not enter judgment on the arbitrator's decision. "The decision of the referee or commissioner upon the whole issue must stand as the decision of the court, and upon the filing of the statement of decision with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court." (§ 644.)

Here, the decision of the arbitrator was filed under the title, "Judgment Following Arbitration," over Judge Kleaver's signature. Even if this was a reference proceeding, however, Judge Kleaver did not have authority to enter a judgment. If this had been a reference proceeding, his filing would have been, at most, a statement of decision, upon which the trial court could have entered judgment. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1999) ¶ 1:488, p. 1-117 ["The court, rather than the referee, renders judgment."]; see also *Modica* v. *Merin* (1991) 234 Cal.App.3d 1072 [285 Cal.Rptr. 673] [decision of court not appealable if no final judgment entered].) No such judgment was entered. This was not a reference and no attempt was made to follow statutory reference procedure.

The parties assert we must look to the intent of the parties. "The stipulation must be ' "interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." . . . The intention of the parties must be first determined from the language of the contract itself. . . . However, where the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract . . . .' " (*Frankel* v. *Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544 [54 Cal.Rptr.2d 128].)

Here, the agreement exudes an intent to enter into an arbitration agreement, not a reference agreement. There were and continue to be on both sides experienced lawyers. I necessarily assume they knew the law and pertinent terms of art. I also assume they meant what they said. If they had intended this document to be a reference or, as discussed below, an appointment of a temporary judge, they would have said so. Now that they know their expression of their desires has missed the legal mark, they assert this court should stretch the law to suit their interests. This we may not do.

Throughout the agreement, the parties refer to "binding arbitration" and the "arbitrator." They agree to an informal procedure with respect to documentary evidence and subpoena of witnesses. Despite the well-known differences between arbitration, reference, and other types of proceedings, they make no attempt to identify this proceeding as anything other than an arbitration proceeding. While the parties' stated intent to have the arbitrator's decision "be treated as a judgment" is inconsistent with an arbitration agreement, it is also inconsistent with a reference agreement, because in a reference proceeding the referee's decision serves as the decision of the

court, not the judgment. It is apparent that the parties would not have us consider their intent as of the time they entered into the agreement. Instead, they want us to find the intent they wish now they had then. By all indications of the parties' intent at the time they entered into the arbitration agreement, they did not intend a reference proceeding.

The parties urge us to find Judge Kleaver was appointed a temporary judge in this proceeding and therefore to find his decision appealable. (Cal. Const., art. VI, § 21; Cal. Rules of Court, rule 244.) This is the fiction the majority adopts to reach the merits. The record, however, does not reflect an intent to agree to a hearing before a temporary judge. Nor does it show intent or action on the part of the trial court to appoint Judge Kleaver as a temporary judge in this action.

To appoint a temporary judge the Constitution requires the judge to take an oath of office (Cal. Const., art. VI, § 21) and the rules of court require the oath of office to be attached to the stipulation and order designating the temporary judge (Cal. Rules of Court, rule 244). The majority notes Judge Kleaver had previously taken the oath of office, because he was a judge. (Maj. opn., *ante*, at p. 11, fn. 6.) That does little to show the parties and the court intended to appoint a temporary judge. It is nothing more than a coincidence that Judge Kleaver was a judge when the parties agreed to arbitrate their dispute with him acting as arbitrator.

The parties, and apparently the majority, assert the failure to conform to all of the technical requirements does not defeat the appointment of a temporary judge. (See *In re Richard S.* (1991) 54 Cal.3d 857, 865 [2 Cal.Rptr.2d 2, 819 P.2d 843].) They miss the point. The total lack of intent to appoint a temporary judge in this action defeats their argument, not a technical failure to conform to all of the requirements. Judge Kleaver was not a temporary judge in this matter. It is nothing but a fiction the parties (and the majority) seek to impose in retrospect. Instead, it is clear Judge Kleaver knew he was acting as an arbitrator. He signed the judgment following arbitration as "arbitrator."

In effect, the parties argue we should ignore the fact they entered into an arbitration agreement and thereby subvert the statutory procedure for obtaining review of an arbitrator's decision. The majority capitulates. There is inherent danger in this strategy. " '[A]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial

action.' . . ." (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 10-11 [10 Cal.Rptr.2d 183, 832 P.2d 899], citation omitted.) While the parties agreed concerning what issues the arbitrator would decide and agreed to have the arbitration proceed under the rules of evidence, they did not prohibit the arbitrator from applying "principles of justice and equity," possibly inconsistent with positions "a party might successfully have asserted in a judicial action."

The effect of the parties' strategy is to allow Judge Kleaver, as an arbitrator, to base his decision upon broad principles of justice and equity in ways perhaps inconsistent with strictly legal principles, while preserving the possibility of obtaining judicial review applying strictly legal principles if the result obtained is undesirable. This strategy is contrary to existing, well-established law. You cannot tell Judge Kleaver he is an arbitrator and then treat him on review as if he were a judge in this proceeding. Accordingly, we cannot revise the arbitration agreement to be a reference agreement or the appointment of a temporary judge. As a result, Judge Kleaver's decision was an arbitrator's decision and is not subject to direct review on appeal without intervening proceedings in the trial court. (See § 1280 et seq.)

Finally, it is bad policy and contrary to this court's practice to rescue an appeal when the parties have failed to obtain an appealable judgment. Tolerance for sloppy and ineffectual lawyering breeds further carelessness and incompetence. "[T]he proper role of an appellate court is to adhere to and apply Code of Civil Procedure section 904.1, not to devise and employ strategies for its wholesale avoidance. As a practical matter, experience teaches that far from solving the problem, the latter approach only exacerbates it." (*Modica* v. *Merin, supra,* 234 Cal.App.3d at p. 1075.)

As the court in *National Union* warned: "[W]e spend too much time trying to make sense out of arbitration agreements precisely because litigants spend too little time in drafting them. Increasingly, we have been presented with incoherent hybrids and bizarre mutations of supposed agreements for judicial or contractual arbitration. Oftentimes the 'remedy' is worse than the disease. We can only warn: Read the label before applying." (69 Cal.App.4th at p. 716.) Here, it is apparent the remedy was worse than the disease. Except for the relatively trivial matter, discussed in the unpublished portion of the majority opinion, of interest on a certain sum, the majority, after expending precious judicial resources, has concluded the arbitrator accurately resolved

the disputes between the parties. This case was especially suited for binding arbitration. The public would have been better served if it had been restricted to that venue.

I would dismiss the appeal.